WILLIAM PARSONS, PLAINTIFF IN ERROR *vs.* JAMES ARMOR AND
T. W. OAKEY, SYNDICS OF THE CREDITORS OF JAMES ARMOR.

Error from the district court of Louisiana. The record consisted of the petition,
the answer, the whole testimony, as well depositions as documents, introduced
by either party, and the fiat of the judge, that Armor, the plaintiff below, recover
the debt as demanded. The difficulty is to decide under what character we
shall consider this reference to the revising power of this court. If treated
strictly as a writ of error, it is certainly not an attribute of that writ, according
to the common law doctrine, to submit the testimony as well as the law of the
case to the revision of this court; and then there is no mode in which the
court can treat this case, but in the nature of a bill of exceptions. The court
is not at liberty to treat this case as an appeal in a court of equity jurisdic-
tion, under the act of 1803; because the party has not brought up his cause by
appeal, but by writ of error. [425]

F. at New Orleans, was the correspondent of P. at Boston, received goods from
him on consignment, and was from time to time directed to purchase produce,
and ship the same to P., and was instructed to draw on P. for the funds to pay
for the same. When he made purchases, " the bills of parcels were made out
in the name of F., and the accounts assured in the books of the different mer-
chants in his name." The general course of the business was, that P, sent
out, in his own vessels, merchandise to F. which was sold by F., and F. at
the request of P. purchased from merchants in New Orleans produce, and
shipped the same as ordered by P.; and to put himself in funds for the same
when necessary, drew bills of exchange on P., who had always, until the pre-
sentation of the bills on which this suit was brought, accepted and paid the
same; but he did not in his purchases act under the idea that he was restricted
in his purchases to the drawing of bills for the payment of the articles pur-
chased for P. F. purchased a quantity of tobacco to be shipped to P,, and
payment for the same in bills on P. made a particular part of the contract for
the purchase. At the time of the purchase, F. showed to the vendor of the
tobacco the letters from P., ordering the purchase and shipment of the same.
Some of the bills drawn by F. on P., and which were delivered to the vendor
of the tobacco in payment for the same, were refused acceptance and pay-
ment, and this suit was instituted for the recovery of the amount of the bills
from P. Held, that P. was not liable to pay the bills. [426]

The general rule is, that a principal is bound by the act of his agent no further
than he authorises that agent to bind him; but the extent of the power given
to an agent is decided as well from facts as from express delegation. In the
estimate or application of such facts, the law has regard to public security, and
often applies the rule " that he who trusts must pay." So also, collusion with
an agent to get a debt paid through the intervention of one in failing circum-
stances, has been held to make the principal liable on the ground of immoral
dealing. [428]

A bill of exchange is the substitute for the actual transmission of money by sea
or land. Power therefore to draw on a house in good credit, and to throw the

[Parsons vs. Armor and Oakey.]

bills upon the market, is equivalent to a deposit of cash in the vaults of the agent. There is not the least tittle of evidence in this cause to show that P. meant to use the credit of the drawer of the bills on which the suit is brought, or to authorise him to pledge his credit in any thing but the negotiation of the bills. This depended on the confidence which merchants of New Orleans who wished to remit would place in the solvency and integrity of the drawer and drawee; and had no connection whatever with the application of the money thus raised to the purchases ordered by the principal. As to those purchases, the agent was authorised to go no further than to apply the funds deposited with him. [428].

Of the general power to protest the bills of one who has overdrawn, there can be no question; for it is the only security which one who gives a power to draw bills, and throw them on the market, has against the bad faith of his correspondent. He takes the risk of paying the damages, if in fault; or of throwing them on the other, if he has actually abused his trust. It is a question between him and his correspondent. [429]

The currency which a merchant may give to bills drawn on him by a correspondent, by payment of such bills, does not deprive him of the security he has a right to, by refusing his acceptance of other bills so drawn. [430]

It does not affect the merits of this cause, that the original contract was made for a payment in bills. Such was not the negotiation to which P. had limited F.; it was no more between P. and the vendor of the tobacco than a purchase of bills with the cash received for the tobacco. [430]

THIS was a writ of error to the circuit court for the eastern district of Louisiana.

James Armor, a merchant of New Orleans, sued William Parsons, a merchant of Boston, in the parish court of New Orleans, by petition, setting forth, that in June 1825, he sold to one Eben Fiske, acting as the agent of Parsons, tobacco to the amount of $17,311 99, in consideration whereof Fiske drew sundry bills of exchange on Parsons, all which were honoured and paid, except two, one for $1443 29, and the other for $4123 71, which were not accepted or paid; and charging that Parsons owes him the amount of the two bills, viz. $5567. Certain merchants of New Orleans were sued as garnishees of Parsons. The cause was duly removed into the circuit court of the United States; and James Armor having failed, he himself and Oakey were appointed syndics of his creditors.

Some objection to the jurisdiction was taken, and overruled; and a general answer put in, by Parsons, denying his liability.

The bills of exchange were dated July 2, 1825; one was

[Parsons vs. Armor and Oakey.]

for $1443 29, at 60 days; the other, for $4123 71. The drawing, presentment, and protest of these bills were proved.

When the cause came to be heard, both parties waived the trial by jury, and agreed that the court should decide whether the defendant was responsible to the plaintiffs, upon the facts as they appear disclosed in writing, and filed in the case.

The papers filed in the case, and brought up with the record, contained admissions that, by the laws of Massachusetts, the rate of interest is six per centum per annum, and ten per cent. damages on protested bills of exchange; and that, by the laws of Louisiana, the interest is five per cent. per annum on bills protested from the date of protest, and the like damages of ten per centum.

The depositions and the evidence in the cause were also in the record, set out at large. The depositions proved the course and nature of the business carried on by Eben Fiske at New Orleans, and also the particulars of some of the transactions between Mr Parsons and Mr Fiske. The deposition of Mr Fiske states these transactions and their character more fully. The deposition is as follows:

Eben Fiske, a commission merchant in New Orleans in 1825, a witness for plaintiffs, states that in the fall of the year 1821 he commenced transacting business for the defendant, Mr Parsons of Boston, in the city of New Orleans, and so continued up to the latter end of the summer of 1825. That during this period, between 1821 up to 1825, witness was the only person transacting business for said William Parsons in the city of New Orleans. That the general course of the transactions between them was, that the said Parsons sent out to New Orleans iron, steel, nails, brads, &c. consigned to witness, which he, witness, would sell as occasion offered, most frequently on credit. That the vessels of said Parsons visited New Orleans every year, when witness, on account of said Parsons, purchased from the merchants of New Orleans tobacco, cotton, logwood, and such articles as Mr Parsons would request, which were put on board the vessels of said Parsons, and on his account transported to different ports in Europe and America. To put himself in

funds for these purchases so made, witness drew his bills of exchange on said Parsons of Boston, which had always been duly accepted, and paid up to the month of August 1825, when the first bill, so drawn by witness on said Parsons, was protested. The purchases so made by witness each year, in the business season, for the articles required by Mr Parsons, were to a large amount, from fifty thousand to one hundred thousand dollars annually: that accounts current were kept between them, witness and said Parsons; that witness would charge said Parsons with purchases made for him, as well as for the disbursements of his vessels and other expenses and charges, and would credit said Parsons with bills drawn on him from time to time, and the proceeds of nails, iron, steel, &c. as sold. The nature of transactions between witness and said Parsons will appear from the accounts.

In June 1825, witness purchased, on account of said Parsons, from James Armor, a merchant of New Orleans, one hundred and eighty hogsheads of tobacco, the nett amount of which (after deducting, as customary, one half of the expenses of cooperage) was $17,311 92 cents, for which witness drew bills of exchange at sixty days sight, on William Parsons at Boston, all of which were paid, except two : to wit, one bill for $1443 29 cents, and the other for $4123 71 cents, which said two last bills were protested for non-acceptance and non-payment by the said Parsons. At the time witness went to said Armor to purchase said tobacco, he stated to said Armor that he was about to purchase the same on account of William Parsons, and that he would give bills on the said Parsons. Witness then showed said Armor the letters of said Parsons which refer to the order for purchasing tobacco for loading the Mary and Betsey : witness, on some occasions, would show letters of said Parsons to merchants in New Orleans from whom he was about making purchases, but did not show all said letters.

From the course of business between witness and said Parsons for the several years that he had been transacting business for said Parsons in New Orleans, their business had become generally known in said city; and from the great

[Parsons *vs.* Armor and Oakey.]

number of bills which witness had annually drawn on said Parsons, these bills had gained currency in the market of New Orleans, and he has no doubt that they were received by the several merchants who took them, under the firm conviction that Parsons would accept; at the time the purchase was made from Mr Armor in 1825, two vessels, the Mary and Betsey, belonging to said Parsons, were lying in the port of New Orleans, waiting for cargoes of tobacco, which witness had been instructed by said Parsons to purchase for him; witness purchased, in 1824, tobacco from James Armor for William Parsons, and which was paid for by drawing bills on said Parsons by witness, all of which were duly paid by William Parsons. The one hundred and eighty hogsheads of tobacco referred to were, after they were so purchased from James Armor, shipped on William Parson's account on board his vessels aforesaid to Europe. At the time, in August 1825, when William Parsons began to protest the bills of witness, he, witness, had on hand a quantity of steel belonging to said Parsons unsold, and had also sold iron, nails, &c. to a considerable amount, which was not then due, and which could not be applied to the purchases.

In the balance of $11,631 23 cents against witness, as per account current in November 1824, were included some of witness's exchange on Mr Parsons, as witness had overdrawn the amount of purchases, having sustained a very heavy loss by the failure of A. Fiske, in 1822.

In the season of 1825, the purchases of witness for Mr Parsons, and the disbursements of his vessels, and the amount of drafts drawn after the rendition of accounts in November 1824, up to the close of operations in purchasing and drawing in 1825, will appear from correspondence and accounts. The amount of bills drawn in 1825, and which were protested by Mr Parsons, was about $39,137 79 cents; witness, from his declarations, and the course of his business, must have been known as acting for Mr Parsons in these purchases of the merchants of New Orleans. The vessels of Mr Parsons had left the port of Orleans previous to any

intelligence having been received at New Orleans of his protesting witness's bills.

Witness states that, when he made purchases, the bills of parcels were made out in witness's own name, and the accounts assured in the books of the different merchants in his name; that this is the usual manner in which bills of parcels are made out, and accounts kept in New Orleans, although it may be well known between the parties that the merchant who sells is selling the property of others on commission, and that he who buys is buying as the agent of another.

Witness had been instructed, as appears by the letters of Mr Parsons, to re-sell any tobacco not suited to the market to which Mr P. was shipping, when, in purchasing a lot, he, witness, should be obliged to take some of such quality; witness did accordingly re-sell a few hogsheads, which had been principally purchased from Bedford, Breedlove and Robeson. Captain Mayo was then here with the Mary. Witness, by his letters of the 1st of July 1825, informed Mr Parsons that he had purchased one hundred and forty hogsheads, which was stowed on the 7th of the same month, previous to which the tobacco had been weighed, and found to be only one hundred and thirty-two hogsheads. No reference was made to that of the 1st of July, as witness wrote in haste, being about dispatching the Betsey and Mary. The information of Captain Mayo, as given to Mr Parsons, as appears from Mr Parsons's letters, that he, witness, was selling tobacco to the extent it was construed by Mr Parsons, as he states in his letters, was incorrect, as witness had only re-sold as before stated.

*Cross-examined.* Fiske was a commission merchant in New Orleans, and was the correspondent of Parsons, from whom he received goods on consignment for sale, and transacted his business exclusively in New Orleans, from the year 1821 to the month of July 1825; and in all purchases made by Fiske for Parsons, he, Fiske, received the accounts and transacted the business in his own name, and never signed his name as agent for Parsons.

EBEN FISKE.

[Parsons *vs.* Armor and Oakey.]

The whole correspondence between Mr Parsons and Eben Fiske was set forth at large in the record, commencing on the 19th of October 1821, and terminating on the 19th of November 1825.

The first letter from the plaintiff in error to Eben Fiske, was dated October 1, 1821; and the letter under the authority in which their transactions commenced, was dated October 19, 1821. Those letters were as follows:

*Boston, October 1st,* 1821.

Mr Eben Fiske,

Sir: I am sorry at any time, especially at the commencement of a correspondence with you, to request a favour, which you may think unpleasant, but hope you may be induced to comply with. My request is, that you would call on Messrs William and Nathaniel Wyer, for advice respecting a balance I have in their hands, but at my risk. You have above a copy of part of their letter to me, dated 27th February 1819; from that to the present day, I have not been able to get any reply from them to my letters on that subject. I wish you to call on them for an explanation; if they have received the money, please to receive it from them; if they have not, presuming you must know the person who purchased the steel, you can determine if it can ever be collected. I wish you to pursue such measures to have the debt collected, as if it was your own.

I enclose you a letter for Messrs Wyer: after reading, please to seal, and hand it to them.

I am, very respectfully, your humble servant,

WILLIAM PARSONS.

*Boston, October 19th,* 1821.

Mr Eben Fiske,

Sir: I am sorry I had not the pleasure of a personal interview with you, when you were in Boston; I received your letter. I have concluded to send the brig Betsey, John Virgin master, for New Orleans. She will probably sail next week; if you can purchase one hundred and fifty hogsheads of very good old tobacco, should there be any at market; one

hundred bales of clean white Tennessee or Alabama cotton; and to fill up with good Campeachy logwood ; the tobacco not to cost more than, 4 or 4½ dollars, the logwood from 18 to 22 dollars; if higher than that, take only as much as will stow in breakage, and fill up with tobacco and cotton, one half each. If these articles can be procured, I wish it done at once: if the tobacco cannot be procured by the brig, I will give captain Virgin instructions to communicate to you what to load the vessel with. You will please draw on me for the funds to pay for the cargo.

I am, &c.

WILLIAM PARSONS.

*October* 20*th.* You will please to supply captain Virgin with his adventure, and take his draft on me for the amount, say ten or twelve hundred dollars, which shall be duly honoured, or charge me with the amount, in account; also furnish captain Virgin with the adventures for some others, and charge to account as above.

I am, respectfully, your humble servant,

WILLIAM PARSONS.

On the 9th of June and on the 8th of August 1825, the plaintiff in error wrote to Eben Fiske, as follows :

*Boston, June* 9, 1825.

Mr Eben Fiske,

Dear Sir: I have your favours of the 30th of April and 5th of May. I wish that your opinion may prove correct, and that tobacco may be at such a price that you may be able to load the Mary and Betsey. The Mary, from my letters to Captain Mayo and yourself, I think you will load, but fear the market in Gibraltar will not rise in proportion. From my last accounts, Mr Sprague was selling at $7½ per cwt. The article in Gottenburg, late in April, was very dull, and had risen but a very trifle. If the Betsey cannot be loaded for Gottenburg, get a freight for her for New York or Boston, or any northern port. Apply all the funds you have, and which you say will be convenient for you to

[Parsons *vs.* Armor and Oakey.]

invest, to load the Mary. It will not answer to purchase for the Gibraltar and Gottenburg markets for another voyage, to stand at a higher rate than my limits. You may possibly be able to purchase two hundred hogsheads of very fine, not to go higher than 6½ cents. By purchasing late, you will be able to apply the proceeds of nails sold, which will then be due. As you have given me assurances that you will apply all my funds in your hands at that period, I cannot have any doubt on the subject.

The Betsey is insured in this city. The papers must be clear and regular, to recover from the underwriters. I enclose a letter for Captain Wallis, should he be with you, in conformity with what I write you. Your draft of the 6th of April, to John Clark, sixty days, for $372 18 cents, without advice, has been paid.

I am respectfully, your humble servant,

WILLIAM PARSONS.

*Boston, August* 8, 1825.

Mr Eben Fiske,

Dear Sir: I wrote you on the 26th of July and 4th instant. I now enclose you an abstract of my account with you. From my letters to you the past season, you will readily perceive my determination to have my account settled with you this season. The payment for the one hundred and thirty-two hogsheads of tobacco you purchased to ship to Boston, I shall not accept for until I receive it myself, or by my agents. If, from any cause, it should not be shipped before you receive this, I request you to deliver it to Messrs Howard and Merry; also, any nails or steel you may have unsold, or the notes received for any nails or steel which are not paid for: also, Mrs Richards's note, a bad debt, for $673 23 cents. Their receipt shall be evidence for me to pay any balance that may be due on settlement of the account. Your drafts not come to hand, to a larger amount than the last of the one hundred and thirty-two hogsheads of tobacco, will give you time to comply with the foregoing requisition from me.

I am, respectfully, your humble servant,

WILLIAM PARSONS.

[Parsons *vs*. Armor and Oakey.]

The letter advising of the drafts, which were the subject of the suit, was this following:

New Orleans, 2d of July, 1825.

WILLIAM PARSONS, ESQ.

Sir: I have drawn on you this date, for three drafts, as follows, favour John Clark,

No. 42, for $4123 71 cents, 60 days, three per cent discount, net $4000.

No. 43, for $1443 29 cents, 60 days, three per cent discount, net $1400.

No. 44, for $1631 75 cents, 60 days, three per cent discount, net $1583.

The above are in place of exchange, advised under dates of yesterday, of the same numbers, and which by mistake were drawn for the net amount, instead of the gross. The same are destroyed.

I am, respectfully, your obedient servant,

EBEN FISKE.

Judgment was given for the plaintiffs in the circuit court, whereupon the defendant brought this writ of error.

Such of the facts and correspondence as were considered important, and which have been omitted in this statement, are referred to in the opinion of the court.

The errors assigned were:

1. Fiske was not the agent of Parsons, nor was he authorized to purchase on Parsons's account.

2. The merchandise was not in fact sold on the credit of Parsons, but on the credit of Fiske, or on the belief that Parsons would accept his bills.

3. The facts and correspondence do not show that Parsons was bound to accept the bills.

Mr Livingston and Mr Webster, for the plaintiff in error; after an examination of the facts of the case, contended : that the principle upon which the court below had proceeded, would make Parsons liable for all the bills drawn by Fiske in the course of his business in New Orleans. The

real nature of the transactions between Fiske and the plaintiff were fully shown by the testimony of Fiske. It was a dealing between a factor and his principal; the principal being abroad and not known. In such a case the factor alone is liable. Paley on Agency, 257. 1 Bos. & Pul. 363. 3 Bos. & Pul. 489. Buller's Nisi Prius, 130. 4 Taunt. Rep. 574.

It is agreed that Armor can only make Parsons liable as a purchaser of the property. 2 Livermore, 199. If Fiske was the purchaser, Parsons was not liable.

Parsons could only be liable on one of two grounds; either that the original credit was given to him, or that Fiske was authorised to draw on him for the purchases specifically. These are not supported by the evidence.

An authority to draw gives a right to the holder of the bill as holder, not to the vendor of the goods as vendor, in payment of which the bill was given. Suppose Fiske had drawn two bills, one for the payment of the goods, the other for his own use. The refusal of Parsons to accept the bills would have made him liable to Fiske only.

The case of Cooledge vs. Payson, 2 Wheat. 66, decides that the drawer is liable to pay a bill after a particular promise to accept it. Cited also, Shimmelpennick vs. Bayard, 1 Peters, 264. The doctrine contended for, on the part of the plaintiff below, would render Parsons liable both to the vendor and to Fiske. To Fiske, by non-acceptance of the bill; to the vendor, for the goods. If both can recover there would be two concurrent creditors for the same debt; which is impossible, according to the cases cited. 15 East, 64.

The case is then one of factor and principal abroad; and the case in Taunton shows, that the situation of the foreign principal is not altered, whether or not the goods came to his hands.

There is nothing in the correspondence which will authorise the assertion, that there was a general direction to buy the particular property on bills. It is said Fiske was the general agent; we say he was the factor.

Mr Jones, for the defendant, argued; that there was evi-

[Parsons *vs*. Armor and Oakey.]

dence in the case sufficient to show that Fiske was the agent, and Parsons the principal in the transactions out of which the claims arose, and that Fiske had power to draw the bills.

A commission merchant may not be an agent, but their characters are perfectly consistent; and in the case before the court, the articles were not purchased on account of the agent, but for Parsons. If one is in the habit of purchasing for another, as Fiske was in this case, and so acting for four years; this is evidence of agency, in the absence of proof to show that it had ceased. Though the agent should exceed his private instructions, it would not affect those who deal with him as agent, or impair their claims on the principal.

In this case there is no complaint that the instructions were exceeded; the reason for not paying the bills was not this, but that a balance was due from the agent to the principal, and that he should have paid for the purchases out of funds in his own hands.

He had authorised Fiske to draw, without regard to the balance due to him.

Mr Justice JOHNSON delivered the opinion of the Court.

This cause is brought up by writ of error from the district court of Louisiana district, exercising circuit court jurisdiction, in a suit in which the cause of action was in the nature of a quantum valebat, for a quantity of tobacco sold; but according to the practice of that court, the suit was prosecuted in the forms of the civil law, and the judgment rendered by the court, the parties having waived the trial by jury. The record consists of the petition, the answer, the whole testimony, as well depositions as documents, introduced by either party, and the fiat of the judge that Armor, the plaintiff below, recover the debt as demanded.

In the argument, counsel considered the cause as in nature of a case stated, that is, a substitute for a special verdict; but this court could not avoid noticing that the precedent might involve it in the necessity of exercising jurisdiction over cases of a very different character. This writ of error does not bring up a mere statement of facts, but a

mass of testimony, and however consistent and reconcilable the testimony may be in this case, it may be very different in future causes coming up from the same quarter, and by means of the same process.

The difficulty is to decide under what character we shall consider the present reference to the revising power of this court. If treated strictly as a writ of error, it is certainly not an attribute of that writ, according to common law doctrine, to submit the testimony as well as the law of the case to the revision of this court; and then there is no mode in which we could treat the case, but in the nature of a bill of exceptions; that is, to confine ourselves entirely to the question, whether, giving the utmost force to the testimony in favour of the party in possession of the judgment below, he was legally entitled to a judgment. But this would often lead this court to decide upon a case widely different from that acted upon in the court below. There may be conflicting testimony, and questions of credibility in the cause, which this court would be compelled to pass by. This would be increasing appellate jurisdiction on principles very different from the received opinions and judicial habits of that state; and it has been argued, equally inconsistent with the rights extended to them by congress.

We feel no difficulty from the bearing of the seventh amendment of the constitution in this case; because if this be a suit at common law in the sense of the amendment, the object was to secure a right to the individual, and that right has been tendered to him and declined. The words of the amendment are, " the right to the trial by jury shall be preserved." Nor are we at liberty to treat this as *an appeal* in a cause of equity jurisdiction under the act of 1803; because the party has not brought up his cause by appeal, but by writ of error.

The present case is one which may be treated as a bill of exceptions, or a case submitted; since, giving the utmost force to the testimony in favour of Armor, we are of opinion that the judgment must be reversed. We shall proceed, therefore, to examine the merits upon that principle, with-

out committing ourselves either upon the extent of the appellate power of this court over that of Louisiana, or the appropriate means of exercising it.

The merits of this case may be comprised within the following state of facts :

Parsons was a merchant and considerable ship owner, established in Boston, and in the habit of trading to New Orleans. Eben Fiske was a commission merchant, established in New Orleans, with whom Parsons opened a correspondence on the 1st of October 1821, with a commission to call upon his previous correspondents, W. and N. Wyer, for a balance supposed to be in their hands. The transactions, in the course of which the purchase was made which constitutes the present cause of action, commenced with the letter of the 19th of October 1821 ; the tenor of which furnishes the true exposition of the nature and extent of the mandatory power under which Fiske acted for Parsons. The material passages are these :

"I have concluded to send the brig Betsey, John Virgin master, for New Orleans. She will probably sail next week. If you can purchase one hundred and fifty hogsheads of very good tobacco; should there be any at market, &c. If these articles can be procured, I wish it done at once, &c. You will please draw on me for the funds to pay for the cargo."

The examination of Fiske furnishes these further explanations of the relation in which he acted with regard to Parsons. In the latter part of his deposition he says, " he was the correspondent of Parsons, from whom he received goods on consignment, and transacted his business exclusively in New Orleans from the year 1821 to July 1825; and in all purchases by him for Parsons, received the accounts and transacted the business in his own name, and never signed his name as agent for Parsons ;" and further, " that when he made purchases, the bills of parcels were made out in his, Fiske's, name, and the accounts assured in the books of the different merchants in his name." And in the commencement of his deposition, he says, " that the general course of the transactions between them was, that the said Parsons sent out to New Orleans iron, steel, &c. consigned

to witness, which he would sell as occasion offered, most frequently on credit. That the vessels of the said Parsons visited New Orleans every year; when witness, on account of said Parsons, purchased from the merchants of New Orleans tobacco, cotton, &c., and such articles as Parsons would request, which were put on board of Parsons' vessels, and on his account transported to different ports of Europe and America. To put himself in funds for these purchases so made, witness drew his bills of exchange on said Parsons, which had always been duly accepted and paid, until August 1825." " That witness would charge said Parsons with purchases made for him, as well as for the disbursements of his vessels and other expenses and charges, and would credit said Parsons with bills drawn on him from time to time, and the proceeds of nails, iron, steel, &c. as sold;" and then refers generally to the accounts annexed to the deposition for further explanations on the nature of their dealings.

By reference to these accounts it appears that the bills were disposed of generally at market as opportunity offered; and that he never acted under the idea of being restricted to the drawing of bills to pay the vendor in that mode, specifically, for each purchase.

With regard to the particular purchase under consideration; Fiske swears that the payment in bills made a part of the contract, and that the bills drawn were all paid except two, making up the balance here sued for. And it has been thought to have some influence upon the merits of plaintiff's demand, that at the time of this purchase, Fiske stated to Armor that he was about to purchase on account of Parsons, and showed him the letters of Parsons which refer to the order to purchase tobacco for loading the Mary and Betsey; for which object this purchase was made. How far the case of the plaintiffs below can be aided by those letters will presently be seen.

The simple question under this state of facts is, was Parsons chargeable to Armor as vendor of this parcel of tobacco? This must be decided either upon the general

powers vested in Fiske, or the particular circumstances of this purchase.

The general rule is, that a principal is bound by the act of his agent no farther than he authorises that agent to bind him; but the extent of the power given to an agent is deducible as well from facts as from express delegation. In the estimate or application of such facts, the law has regard to public security, and often applies the rule, that " he who trusts must pay." So, also, collusion with an agent to get a debt paid, through the intervention of one in failing circumstances, has been held to make the principal chargeable on the ground of immoral dealing. To one or other of these heads all the cases are reducible; and into one or other of these classes it is necessary to bring the present case, or Parsons is not chargeable.

It has been argued, that Fiske was the general agent of Parsons, for the purchase of cargoes to load his vessels, and as such had power to bind him as original vendee to this plaintiff. That he possessed a general power to draw bills in payment for such cargoes, and was either bound to accept such bills, or became bound by colluding to create a credit to Fiske, which exposed the community to imposition.

But all this argument turns upon a misapprehension of the nature of the transactions between Parsons and Fiske.

Every one knows that a bill of exchange is the substitute for the actual transmission of money by sea or land. Power therefore to draw upon a house in good credit, and to throw those bills upon the market, is equivalent to a deposit of cash in the vaults of the agent. There is not the least tittle of evidence in the cause to show that Parsons meant to use the credit of Fiske, or to authorise him to pledge the credit of Parsons in any thing but the negotiation of bills. This depended on the confidence which merchants who wished to remit from New Orleans would place in the solvency and integrity of the drawer and drawee, and had no connection whatever with the application of the money thus raised to the purchases ordered by the principal. As to those purchases, the agent was authorized to go no farther

than to apply the funds deposited with him.    And the case is reduced to the plain and simple rule to be found every where, from the time of Shower and Lord Holt, down; " that if I give my servant money to purchase for me, and he use it, and purchase on credit, I am not bound, though the article come in fact to my use."

There are few, if any cases, to be found in modern English books on this subject; for the plain reason, that the nature and effects of such a commission or employment, are too well understood in that country to have admitted of litigation.    All the cases which have arisen there of a recent date, except where the ground of collusion has been resorted to, are cases of purchases on credit.    Such are those of Addison and Gandasequi, and some others that have been quoted.    The case of Wilson *vs*. Hart, 7 Taunt. 295, was a case of collusion.

If, in the present case, Parsons were chargeable with any unfair dealing, or the practice of uncandid or collusive means of saving the balance for which it appears Fiske had overdrawn; it cannot be questioned that he is chargeable. But on this part of the case two considerations are important, the first of which relates to the amount of the bills which Parsons refused to accept, and the second, the particular notice communicated to Armor of the object and limits of Fiske's power to draw.

Of the general power to protest the bills of one who has overdrawn, there can be no question, for it is the only security which one who gives a power to draw bills and throw them on the market, or perhaps to draw at all, has against the bad faith of his correspondent.    On this subject he takes the risk of paying the damages, if in fault, or of throwing them on the other, if he has actually abused his trust.    It is a question between him and his correspondent.

It is true that in this case the amount protested appears to have gone far beyond the balance acknowledged by Fiske. But then Fiske held a large quantity of tobacco in store, which Parsons might very well suppose would not be given up to his order after protest of the bills; and in refusing payment to such an amount may have had in view an indemnity.

against this further loss; a loss which actually was incurred; so that in this he is not chargeable with mala fides.

The second consideration is equally important in its bearing upon this part of the case.

Parsons, in his correspondence, alleges as his justification for refusing acceptance, that he had limited Fiske in his purchases for the Mary and Betsey, to the application of the *funds in his hands.* The balance due on general account by a correspondent is, in mercantile language, a fund in his hands; and so the correspondence shows that it was understood to be in this instance. Fiske swears, that, at the time of the purchase from Armor, he showed Armor the letters from Parsons, on the subject of the purchase of the cargo for the Mary and Betsey, and by referring to the letters of the 9th of June and 5th of July 1825, which must be here meant, we find both expressly referring to the application of "funds in hand," and the latter intimating that the whole purchase will scarcely absorb "all the funds in hand."

So direct an intimation that the purchase of these cargoes was to balance the accounts between them, removes all ground for imputing collusion to parties.

As to the currency given to these bills by the regular acceptance and payment of them up to the date of the bills; if this is to deprive a merchant of the only check he has for his security, by preventing him from ever refusing his acceptance, credit would become a misfortune.

Nor does it affect the merits of this cause, that the original contract was made for a payment in bills. Such was not the negotiation to which Parsons had limited Fiske; it was no more, as between Parsons and Armor, than a purchase of bills, with the cash received for the tobacco; and a purchase against which Armor was not without a warning, furnished by the letters which Fiske, his own witness, swears he submitted to Armor, prior to the negotiation. It was creating new funds for a purchase, not purchasing with the funds already created, or in the hands of Fiske.

Judgment reversed.