THE MICHIGAN STATE BANK *v.* THE ESTATE OF HENRY LEAVENWORTH.

*Letter of credit. Revocation by death of signer. Discharge of surety.*

A person holden as surety on a letter of credit will be discharged if, without his consent, after the maturity of the paper, for the payment of which he is holden, the

holder receive as collateral security for its payment another obligation with other sureties payable at a future time.

The death of a person who has given a letter of credit authorizing another to value on him to a certain amount for a limited period, and agreeing to accept the drafts drawn, and pay them if not paid by the drawer at maturity, will operate as a revocation of all authority to thereafter draw on him, though the person to whom, and for whose security the letter was given, has no notice of the death, and the period for which the authority was given is unexpired.

Such a letter of credit dated and given in this state to a person in Michigan, specifying no place at which the drafts are to be made payable, will not bind the signer to the acceptance, or payment of drafts payable in New York; ISHAM J. (But see *same plaintiff* v. *Pecks* ante p. 200.)

APPEAL from the decision and report of the commissioners appointed to examine and adjust claims against the intestate's estate. The facts in the case were agreed upon, and were as follows.

A paper of which the following is a copy

"*Burlington, Vt.*, 24th December, 1853.

" To the President and Directors of the Michigan State Bank.

" Gents:—We authorize Messrs. Roelofson, Hatch & Co., of "Detroit, to value on us or either of us, through your bank, at any "time before 1st Jan. 1855, for such sum or sums, as they may see "fit, not exceeding in the aggregate at any one time thirty thous- "and dollars, and on such times as they may find necessary; and "such drafts, drawn upon us individually or otherwise, we, for val- "ue received, jointly and severally agree to accept and pay if not "paid by the drawers at maturity."

"W. H. WILKINS, Jr.
"H. W. CATLIN,
"H. LEAVENWORTH."

was, at its date, executed by the persons whose names are annexed to it, and sent by the said Catlin to the said Roelofson, Hatch & Co., at Detroit, Michigan, by whom it was duly received, and by them it was, soon after its date, at said Detroit, delivered to and accepted by the plaintiffs. The intestate was only a surety on said paper, and this was known to the plaintiffs at the time they received it. Upon the faith and credit of said paper, the plaintiffs, at the request of Roelofson, Hatch & Co., discounted and paid to them, at Detroit, bills of exchange according to the following table;

Michigan State Bank *v.* Estate of Leavenworth.

| Date of bills. | Drawers. | | | Drawees. | | Am't. | Due. | When paid, if paid at all. |
|---|---|---|---|---|---|---|---|---|
| 1854. | | | | | | | 1854. | 1854. |
| Mar. 4. | Roelofson, Hatch & Co. | | | J. & J. H. Pecks & Co | | $5,000 | May 7. | May 6. |
| May 2. | " | " | " | " | " " | 5,000 | July 5. | July 5. |
| Feb. 11. | " | " | " | H. W. Catlin, | | 2,500 | May 14. | May 16. |
| Feb. 25. | " | " | " | " | " | 4,500 | May 28. | May 27. |
| Mar. 10. | " | " | " | " | " | 2,500 | Apr. 12. | Apr. 12. |
| Mar. 10. | " | " | " | " | " | 2,500 | Apr. 27. | Apr. 27. |
| Mar. 11. | " | " | " | " | " | 3,000 | June 14. | June 14. |
| | | | | | | $25,000 | | |
| 1854 | | | | | | | | |
| May 8. | " | " | " | " | " | $5,000 | July 11. | |
| May 26. | " | " | " | " | " | 1,000 | July 29. | |
| June 3. | " | " | " | " | " | 2,000 | July 16. | |
| June 3. | " | " | " | " | " | 2,000 | July 26. | |
| June 3. | " | " | " | " | " | 2,000 | Aug. 5. | |
| June 19. | " | " | " | " | " | 3,000 | Aug. 22. | |
| June 13. | " | " | " | " | " | 5,000 | Aug. 16. | |
| | | | | | | $20,000. | Not Paid. | |

The last mentioned seven bills were dated at Detroit, Michigan, made payable at the Empire City Bank, New York, and were duly accepted by Catlin, and were presented for payment when due, and payment thereof demanded, and refused, and were duly protested therefor, and all the parties thereto were duly notified of the dishonor thereof; and said bills had ever been and were still owned and held by the plaintiffs, and were unpaid. On the 10th day of May, 1854, the intestate died at Burlington, where he had theretofore resided and done business, but the plaintiffs had no knowledge or notice thereof, until after the discount of all of said bills.

On the 15th of August, 1854, the plaintiffs applied to Catlin and to the firm of J. & J. H. Peck & Co., who had signed a similar writing in reference to these same drafts, (see *ante* p. 200) for security in respect of the said bills then overdue and unpaid, when said Catlin executed, and said Pecks & Co. endorsed and delivered to the plaintiffs, (who accepted them,) four notes, for the purposes, and on the terms stated in the receipt executed by the plaintiffs' agent at the time, which notes had ever since been held by the plaintiffs duly protested and unpaid; said receipt being as follows,

" Received, Burlington, Vt., August 15, 1854, from H. W. Cat-
" lin, Esq., 4 notes of $3,000 each, payable at the Bank of the Re-
" public in the city of New York,

| | | |
|---|---|---|
| " September, | 14-17 | $3,000. |
| " | 24-27 | 3,000. |
| " October, | 4-7 | 3,000. |
| " | 14-17 | 3,000, |

" endorsed by Messrs. J. & J. H. Peck & Co., and W. H. Wilkins, " as collateral security to the payment of certain papers drawn by " Roelofson, Hatch & Co., of Detroit, upon said Catlin and now under protest."

During the time of these transactions, the plaintiffs were located and doing business at Detroit, in the State of Michigan, and the other parties resided at, and did business in said Burlington.

The said Roelofson, Hatch & Co., J. & J. H. Peck & Co., W. H. Wilkins and H. W. Catlin, were jointly interested and co-partners in the business for which the money obtained upon said bills was used, and were principals, and the intestate was the only surety.

Upon these facts, the plaintiffs claimed to recover the amount due on said seven bills of exchange ; but the county court, November Term, 1855,—Peck, J., presiding,—rendered judgment for the defendant. Exceptions by the plaintiffs.

*G. F. Edmunds* for the plaintiffs.

I. An open guaranty is binding until notice of its recall is actually given to the party who is acting under it.

Death does not revoke an agency, when that agency is coupled with an interest. If it be not necessary to do the act *in the name of the principal,* it may as well be done after his death as before. Story on Agency § 488, *et seq.*

Suppose a banker in New York issues a letter of credit to a person going abroad, and therein agrees to accept his bills, can it be said that a banker in St. Petersburgh must first ascertain whether the signer of the letter is living, before he can advance money upon it ? Such a rule would make an end of commerce between distant places ; 12 Mass. 206, *Cutts* v. *Perkins.*

II. The taking of the notes mentioned in the case, " *as collateral*," did not amount to, or imply, any agreement to extend the time of payment ; 2 L. C. in Eq., pt. 2, 385–6 ; 6 How. 279, *U. S.* v. *Hodge* ; *Ripley* v. *Greenleaf,* 2 Vt. 129.

III. To the objection, that these bills do not come within the contract, on the ground that they were made payable in New York, we answer :

I. *There is no limitation in the contract itself;* it is a general au-

thority to draw, and, under such an authority, it rests with the defendant to show that the place of payment was not usual in the course of business, and such as the parties could not have contemplated; 15 Conn. 475, *Bridgeport* v. *Housatonic R. Co.*

2. It is an inseperable incident to the right to draw, that the drawer (unless special provision is made) may appoint the place of payment; otherwise, he could not direct payment to be made at a bank, even in the place of the residence of the drawee ; and in the present case, *the contract is silent as to the place upon which, or where, the bill should be drawn, or made payable,* and purposely so, no doubt, in order that the parties might draw upon the various markets in which their funds might be received in the course of their trade.

*J. Maeck and Underwood & Hard* for the defendant.

The case shows that Leavenworth was a mere *surety,* and therefore the only consideration for his liability, was the discount by the plaintiffs, and but $ 5,000 of the notes in question are discounted in the life-time of Leavenworth. The law does not require notice of the death to be given, where there is no person who is bound to give it; and notice of the death is not necessary to terminate the authority to draw, or the guaranty ; *Blades* v. *Free,* 17 E. C. L. 83 ; Coll. on Part. § 120 and note, § 538 ; *Caldwell* v. *Stilimar,* 1 Rawle, 217.

The authority to draw, and the promise to accept and pay, does not extend to any bill not drawn in pursuance of the contract.

As there is no evidence, the court must determine, from the contract alone, the extent of the liability.

The defendant living and doing business in Burlington, and executing the contract there, it is not to be inferred that he gave authority to draw drafts at sight, or on time, payable in New Orleans, St. Louis, Detroit or New York, but payable at his own place of business.

It is of great consequence to him, whether he should be at the expense to provide funds in all the commercial cities in the world to meet drafts that may be drawn on him, or be at the risk of paying large damages for exchange and re-exchange, if the drafts should be protested; *Lanusse* v. *Baker,* 4 Pet. 214.

The case shows that after $12,000 of the bills in question had matured, the plaintiff accepted other notes of Catlin, Wilkins, and J. & J. H. Peck & Co., on time, as collateral security, and retained the same, and have sued them, without other evidence, leaving the court to determine what the law will imply from this.

If the law implies a contract to wait until the result of the new security can be known, or 'until it matures, then Leavenworth, being a surety, is discharged. This disposes of the $5,000 ; *Atkinson* v. *Brooks*, 26 Vt.; *Oakie* v. *Spencer*, 2 Am. Lead. Ca. 170 and notes.

The opinion of the court was delivered, at the circuit session in September, 1856, by

ISHAM, J. Independent of the question, whether these bills of exchange were drawn in pursuance of the letter of credit on which the estate of Mr. Leavenworth is now sought to be made chargeable, we are satisfied that, as to those bills which fell due previous to and on the 5th of August, 1854, the estate is discharged from all liability upon them, by the arrangement made on the 15th of August in that year. At that time Mr. Catlin executed four prommissory notes amounting in all to the sum of $12,000, payable in 30, 40, 50 and 60 days after date, which were endorsed by Mr. Wilkins and the firm of J. & J. H. Peck & Co., the latter of whom was not a party to the original bills, nor to the letter of credit. Those notes were received as collateral security for the payment of those bills which were then due and unpaid. The letter of credit, on the authority of which these bills were drawn, was signed by Mr. Leavenworth as surety for the other parties to that instrument. The fact that it was signed by him in that manner was known to the plaintiffs at the time the bills were received by them and discounted. The effect of that arrangement was to give further time for the payment of those bills to the persons primarily liable upon them, until the new securities had matured. It was a suspension of the right of the holder to sue the parties upon them, and an implied undertaking to wait for the payment of the original bills, until the notes fell due. The English authorities to that effect are very decisive, and such seems to be the general current of the American cases. In the case of *Gould* v. *Robson*, 8 East 576, it was

held that the holder, by taking a renewed bill payable at a future time, though under an express agreement that the original bills should be retained in his hands as security, impliedly agreed to give time until the new security became due, and could not sue, in the *interim*, on the original bill; *Stedman* v. *Gooch*, 1 Esp. Cases 14; 2 Amer. Lead. Cas. 182. We are aware that a different rule was held in the case *Pring* v. *Clarkson*, 1 Barn. & Cress. 14, in which the court, after recognizing the general principle that time given to the acceptor of a bill will discharge the other parties, observed, that " in no case has it been said, that taking a collateral security " from the acceptor shall have that effect." That case, however, has not met with the approbation of elementary authors ; Chitty on Bills, 444 ; Bailey on Bills, 341 ; and is considered as overruled in the exchequer by the case of *Kendrick* v. *Lamax*, 2 Cr. & Jer. 405. The case of *Okie* v. *Spencer*, 2 Wharton 253, is a well considered and leading case in this country on that subject. In that case, the holder of a note, on the day it fell due, accepted from the maker a check drawn by him and a third person who were partners, paya- ble six days afterwards, which, if paid at maturity, was to be in full satisfaction of the note. The court held that the check was re- ceived as *collateral security*, that it *suspended the remedy* against the maker of the note during that period, and *was a discharge of the endorser*. The same doctrine was held in the case of *Myers* v. *Willis*, 5 Hill 463, where a surety was discharged when a note had been accepted, payable at a future day on account of a debt for which he was liable. The same principle was subsequently sus- tained in the case *Fellows* v. *Prentiss*, 3 Denio 512. In all cases of that character, so far as those primarily liable for the debt are concerned, the suspension of the remedy will cease when the secu- rity has matured, and ordinarily they may then be sued on the original indebtedness. But in relation to sureties, such a suspen- sion will effect a complete bar to the original right of action ; 2 Amer. Lead. Cas. 183, and cases cited. If Mr. Leavenworth had stood as an endorser of those bills, it would hardly be questioned, but that he would have been discharged by the acceptance of those notes. The effect is the same when they seek to render him liable on that letter of credit which he signed as surety, unless it affirma- tively appears that the remedy against the principals, was reserved

during that period; 2 Vt. 129. We think, therefore, the court were correct in disallowing those bills as subsisting claims against the estate of Mr. Leavenworth.

In relation to the remaining two bills of exchange, dated June 13th and 19th, amounting to the sum of $8,000, a majority of the court consider that they were also properly disallowed, on the ground that they were drawn after the decease of Mr. Leavenworth, which occurred on the 10th of May previous. The objection taken to the allowance of these bills equally affects all the others, except the first, dated on the 8th of May, 1854. The decease of Mr. Leavenworth, it is considered, was a revocation of all authority to draw bills thereafter on the strength of that letter of credit; and in this respect, it is immaterial whether the plaintiffs had notice of his death at the time they received and discounted the bills, or not. The general principle is well settled, that an authority conferred by a letter of attorney must be executed during the life of the principal; for a power to represent another, can only continue as long as there is some one to be represented; Paley on Agency, 156; Bac Abg. Tit. Authority (d); Co. Litt. 52 (b.) In the case of *Hunt* v *Rausmanier*, 8 Wheat. 174, it was held, that a letter of attorney was revoked by the death of the party making it, though it may be irrevocable during his life; same case, 1 Peters 1. The same doctrine was held in *Galt* v. *Gallaway*, 4 Peters 344, in which the court observed that " no principle is better settled, than that the "powers of an agent cease on the death of his principal. If an act "of agency be done, subsequent to the decease of the principal, "though his death be unknown to the agent, the act is void." The reason of that rule is, that upon the death of the principal his estate belongs to his heirs, devisees, or creditors; and their rights cannot be impaired by any act of one who was not their agent, and who has no control over their property; *Harper* v. *Little*, 2 Greenleaf, 14, 18. That rule, however, is subject to the qualification, *that if the authority is coupled with an interest,* it is not revoked by the death of the principal. In such case, it survives the person giving it, and may be executed after his death. That qualification is recognized by both English and American authorities; *Hunt* v. *Rausmanier*, 8 Wheat. 174; 1 Amer. Lead. Cases 567, and cases cited; *Walsh* v. *Whitcomb*, 2 Esp. Cas. 565; *Gaussen* v. *Morton*, 10 Barn.

& Cress. 731; *Smart* v. *Sanders*, 5 Man. Gran. & Scott 894, 916. I have had some hesitancy, however, in coming to the conclusion, that these bills should be disallowed for that reason. The decease of Mr. Leavenworth probably determined the authority of Roelofson, Hatch & Co. to draw bills on him so as to bind his estate for their acceptance and payment. But Roelofson, Hatch & Co. were also authorized to draw jointly and severally upon the other parties to that letter of credit, and for such bills as were drawn upon either or all of them during a given period, Mr. Leavenworth therein gave his written guaranty that the bills should be accepted and paid, While their authority to draw on Mr. Leavenworth was determined, it is difficult to perceive why they were not still authorized, during the period limited, to draw on Mr. Catlin, or either of the other persons who were living, and who signed that letter of credit. The decease of Mr. Leavenworth, it strikes me, could not determine the authority which they had given to draw on them individually; and, if the letter of credit authorized the drafts, it would seem to follow that the plaintiffs could rely on Mr. Leavenworth's guaranty, that they should be accepted and paid. In such case, it is not a question of agency, but of contract, and what will defeat its binding obligation. These bills, however, must be regarded as having been drawn without authority; the decease of Mr. Leavenworth having revoked the authority contained in that letter of credit. Under such circumstances, it was not necessary that notice of Mr. Leavenworth's decease, should have been given to Roelofson, Hatch & Co. in order to determine their authority under it. The revocation was effected by operation of law. In such case, the power of the agent ceases immediately, without any further act being done. But when the revocation is effected by the act of the party, such notice becomes necessary, *Galt* v. *Galloway*; 3 Kent's Com. 63, 67; Story on Part. 336, 7, 9. Partners bind each other by their contracts, on the principle that each is the agent of the others in their partnership transactions. That agency may be determined by operation of law, as by the death or bankruptcy of either. In such case, no notice is necessary to determine the agency of the survivors, as it is when it is determied by their voluntary act; 3 Merivale, 614; 3 Swanston 490; 16 John. 494; Bissett on Part. 102, 104.

The objection which has been taken to the allowance of these bills of exchange, on the ground that Roelofson, Hatch & Co., were not authorized, by that letter of credit, to draw them, payable in the city of New York, is, I think, well taken. This objection affects not only the two last bills referred to, but it equally affects all the bills presented for allowance against the estate. There is no doubt as to the general principle which governs this subject. In 2 Amer. Lead. Cas. 213, 214, it is said that, " nothing is better " settled than that a promise of acceptance must fail altogether, both " as an executory contract, and as a virtual acceptance, whenever " the bill to which it is sought to be made applicable falls without " its limits in any material fact; and that the only safe guide is a " scrupulous adherence to the letter of the contract ;" and when the promise of the defendant is put in the form of a guaranty of future drafts, it will give no right of action unless minutely adhered to ; *Dobbin* v. *Bradley,* 17 Wend. 422 ; *Birkhead* v. *Brown,* 5 Hill 634 ; *Walworth* v. *Thompson,* 6 Hill 540 ; *Murdock* v. *Mills,* 11 Met. 5.

The letter of credit, on the authority of which these bills were drawn, specifies no place at which the bills were to be made payable. They simply agreed to accept and pay such bills as should be drawn on them individually, or otherwise. If the bills were drawn on them jointly, it was a joint agreement to accept and pay them ; if they were drawn on either one of them, it was a joint and several engagement, that they should be accepted and paid as they were drawn. It is unnecessary, in this case, to say whether the parties to that instrument were bound to accept and pay bills of exchange drawn payable at the Michigan State Bank, or whether they should be made payable at the place where the drawees resided and had their place of business. Roelofson, Hatch & Co. were authorized to draw through that bank, and probably the parties contemplated that the money was there to be advanced upon them. In the case of *Lanuse* v. *Barker,* 3 Wheat. 101, Johnson J. observed, " where a general authority is given to draw bills " from a certain place, on account of advances there made, the un- " dertaking is to replace the money at that place." But, on the other hand, it is clear that, if the bills themselves had been drawn, like the letter of credit, without specifying any place of payment, they

would have been payable at Burlington, in this state, where all the parties who signed that letter of credit resided; Chitty on Bills, 172; *Mitchell* v. *Baring*, 10 B. & Cress. 4. But however that may be, it is sufficient in this case to observe that the drawees were not bound by the terms of that contract to accept bills payable in the city of New York. If Roelofson, Hatch & Co. had authority to draw bills payable in that manner, they had equal authority to designate Baltimore or New Orleans as the place of payment. That is not the legal effect of the contract of acceptance, or letter of credit. If these bills had been drawn on Mr. Leavenworth and presented to him for acceptance during his life, he might have refused his acceptance without any violation of his contract. In the language of Bronson, J. in *Birchard* v. *Brown*, 5 Hill 642, he might have said; " That is not my contract, and so long as he can " give this answer truly, he cannot be charged with the debt of his " principal." The acceptance of those bills would have imposed on him the performance of a duty, and a risk in the transmission of funds, and a liability to damages in case they were protested, which by his agreement he had not assumed. The case of *Lanuse* v. *Baker* is an authority on this question. In that case the defendant, who resided in New York, guaranteed the payment of such bills as should be drawn on Tabor & Son, Portland, or himself, at sixty days sight. The bills were drawn on Tabor & Son, Portland, payable in New York. Justice Johnson observed; " we are of opin-" ion that these bills were not drawn in conformity to the assump-" tion of the defendant. Merchants well understand the difference " between drawing bills upon a specified place, and drawing them " upon one place payable in another. We are not to inquire into " the reasons which govern them in forming such contracts." The place where Tabor & Son resided, was named in that letter of credit and guaranty, but the place where the bills were to be made payable was not specified; and if making those bills payable in New York, was unauthorized, it was equally without authority that these bills were so drawn. In the case of *Ulster County Bank* v. *McFarlan*, 5 Hill 432, it was held that a bill at ninety days after date, was not authorized by a letter of credit giving authority to draw at ninety days. The legal effect of the letter of credit was an authority to draw at ninety days sight, and as the bill created a

different obligation, the party was not liable for its payment.  In that case, as in this, the legal effect of the letter of credit was different from that created by the bill.  In the case of *Dobbin* v. *Bradley*, 17 Wend. 425, it was held that a party who was liable as surety or guarantor for the payment of the paper of another, when payable at a particular bank, is not liable when no place of payment is specified, though the paper was deposited in that bank, and notice given to the surety.  The legal effect of a note payable at a particular place, is different from one where no place is specified, and for that reason the surety was not liable for its payment. Bronson, J. observed that " it was immaterial whether the qual-" ification which the party placed upon his liability was reasonable " or unreasonable, or whether it was beneficial to him or not.  He " has a right to judge of that matter for himself.  The cases," he observed, " speak a uniform language on the subject."

The acceptance of these bills by Catlin would probably be considered a waiver of this objection, so far as *these bills* and *he personally* are concerned.  It would not be competent for him to raise that objection after having, by his accceptance, promised to pay them.  But that acceptance can have no such effect against the estate of Leavenworth, as he was not a party to those bills, nor is the estate bound by any act of those persons who signed the contract of acceptance with him, to which no assent on their part has been given.  The fact that, upon the authority of the same letter of credit, bills had been previously drawn, payable in New York, which were accepted by Catlin, and paid at maturity, will have no effect to render *even him liable upon bills subsequently drawn in that manner*, whenever on that account he sees fit to refuse acceptance ; much less will it have the effect to charge other persons who stand as sureties.  The express provisions of that contract cannot, nor can its legal effect be changed or altered by such considerations.  The contract is specific in its provisions, and in making the bills payable in New York, it is clearly at variance with its legal effect.  Where there is no ambiguity in the language of the contract, the law settles its construction, and defines its legal effect.  In such cases, the contract is not open to evidence of extrinsic circumstances for explanation, nor can its legal effect be changed by any practical construction of the parties.  This very

point, as applied to letters of credit, under the authority of which bills of exchange had been drawn, was determined in the case of *Ulster County Bank* v. *McFarlan*, 5 Hill 436. In that case, McFarlan had accepted bills at *ninety days after date*, when he was bound, by the legal effect of his letter, to accept only bills *at ninety days sight.* Justice BRONSON observed, " it would be giv-" ing a new application to the doctrine of estoppel *in pais*, to hold " that it may govern the construction, or control the legal effect of " a written instrument. He might accept bills, whether they were " in conformity to the authority or not, or although they might have " been without the shadow of an authority. *The actual acceptance* " *of the bill produced did not furnish any evidence that he deemed* " *it such a bill as he was bound, by the letter of credit, to pay.*" In a note to that case it is also observed that even an admission of the party, that the bill was drawn within the letter of credit, " would only go *to the construction or legal effect of the letter*, and " therefore ought not to operate." The same doctrine was recognised in *Mendock* v. *Mills*, 11 Met. 14. In that case, bills were drawn, under the authority of a letter of credit, which the defendant agreed to accept when accompanied by a bill of lading and an order of insurance. Several bills had been accepted when no such bills of lading or orders of insurance had been forwarded. HUB-BARD, J., observed that, " the instructions were limited and express, " and though they accepted most of the bills, on the belief that con-" signments would cover them, *yet such acts laid them under no ob-* " *ligation to accept other bills not drawn agreeable to the directions* " *given.*" See, also, *Parsons* v. *Armor*, 3 Peters 430. Leavenworth bound himself to accept and pay such bills only as were drawn in conformity with the letter of credit, and his estate is liable for any breach of that contract. But it is not competent for those who stood in that contract as principals, by any declaration or by any course of dealing, to vary the terms or legal effect of that letter of credit. But, if it could be done, so far as to bind the principals in that contract, that fact of itself would discharge Leavenworth, or any other person who stood upon that contract in the relation of surety.

We are all agreed that the judgment of the county court must be affirmed.