## ALLBRITTON v. SUNRAY OIL CORPORATION.

### No. 4522.

United States District Court
S. D. Texas, Houston Division.

Dec. 16, 1949.

---

2. See United States ex rel. Knauff v. Watkins, 2 Cir., 173 F.2d 599.

J. Edwin Smith, Houston, Tex., for plaintiff, George E. Cire, and Allen, Smith & Neal, Houston, Tex., of counsel.

Vinson, Elkins, Weems & Francis, C. E. Bryson, Gene Woodfin, all of Houston, Tex., and Angus G. Wynne and Philip Brin, of Longview, Tex., for defendant.

MARTIN, Circuit Judge.

In this action for damages for personal injuries, tried to a jury under special issues of fact, the verdict of the jury found the material issues in favor of the plaintiff and assessed his damages at $125,000. Judgment was entered on the verdict of the jury for that amount against the defendant, Sunray Oil Corporation, which has moved (1) for a judgment *non obstante veredicto;* (2) for a new trial; and (3) for a remittitur of the damages. The trial judge has been afforded the benefit of helpful extensive oral arguments, both upon the law and upon the facts, and has considered also the carefully prepared briefs and the authorities therein cited which have been submitted by the able attorneys for both sides.

First, a brief summary of the facts would seem appropriate. The plaintiff, G. A. Allbritton, was an employee of Oil Production Maintenance, Inc., which company made a

56

contract in February, 1947, to do certain repair work on the Barber-C-1 oil well operated by Sunray Oil Corporation. The machinery and the rig necessary to do the repair work were furnished by Oil Production; but Sunray's derrick, which was already in place over the well, was used in the work. The derrick was erected about 1934 and was designed to lift a load of 175,000 to 180,000 pounds.

Allbritton worked on the Barber-C-1 well under the supervision of Oil Production's driller, Everett. Everett received his orders from Oil Production's tool pusher, Colvin. Wyatt was Oil Production's superintendent. Myrick, Sunray's field superintendent, told Oil Production's crew what work to do, and gave his orders to Oil Production's tool pusher most of the time. He gave the same kind of orders to Oil Production's crew that he gave to his own crew. He directed Oil Production's crew to pull out of the hole; to pick up 2-7/8 inch pipe and clean it; to try to circulate; to reverse and circulate; to put El Paso Clay, Baroid and Aquagel into the well; to mill the top of the fish, and when to quit; to try to screw on to the fish; to use mud of a particular viscosity and weight; to get a small taper tap; and to pull only 80,000 pounds.

Cockrell, the President of Oil Production, testified that his crew would obey all of Sunray's orders having to do with the workover of the well, although they would obey the orders of Oil Production's supervisor as to matters concerning Oil Production's machinery. On February 24, 1947, the derrick collapsed and one of the legs struck plaintiff, causing him severe and permanent personal injuries.

The derrick had been inspected some time in 1936 by rig builders. About a year before the collapse of the Barber-C-1 derrick, there had been a storm in that area which blew over another derrick within 200 feet of it. The derrick which was blown down was built on a wooden foundation. Myrick testified that from the time the first derrick was blown over until the Barber-C-1 derrick collapsed no detailed mechanical inspection by experts had been

made of the Barber-C-1 derrick, although new guy wires had been put on it. Johnson, head roustabout for Sunray, testified that the bolts on Barber-C-1 derrick were tightened after the nearby derrick was blown over. He stated further that he inspected the derrick after the bolts were tightened, and saw no loose or rusty bolts or deterioration of the legs. Myrick gave testimony that when the blown-over derrick was rebuilt, the crew tightened up loose joints on other derricks; and that he inspected the Barber-C-1 derrick with Wyatt, Oil Production's Superintendent, before Oil Production started working on the well.

Wyatt said on the witness stand that he made the usual and customary inspection to see if the derrick was safe; that he was looking for defects and that the only defect he saw was the bent gin pole; and that the derrick appeared to him to be safe. He stated that he just looked the derrick over and did not have any one look into it and inspect the joints. He admitted that he could not have discovered rusty bolts unless he had gone up into the derrick.

On the morning after the Barber-C-1 derrick collapsed, Bruce Allbritton, the plaintiff's brother, inspected it. He testified: "The bolts from the bottom of the first starting leg up where they goes together, those bolts were pretty rusty; in bad shape. The piece that goes around the derrick leg was rusted bad, and the bottom piece that sets down on the piece there—was—in places you could stick a match through it." He said that this bottom piece was "low on the concrete foundation, where it was bolted into the leg of the derrick." He made the further assertion: "This leg is down on this plate. This plate right in here for the other, that was eat up." Questioned further, he answered that the plate was eaten up with rust, and pointed out: "Up here as this other leg comes in about nine or twelve feet up; it is between ten and twelve feet to the next leg starts again, this place right in here where these bolts are was rusted, and the plate behind the leg was rusted out."

Myrick testified that he examined the derrick after it had collapsed, that he couldn't find any defect in it; and that he

saw no rust on the derrick leg. He stated that the pieces above the plate had broken, that this was a new break; and that he could not see any deterioration in the material. Johnson, head roustabout for Sunray, stated in his deposition that he examined the derrick after it had collapsed and found the legs on the draw works side buckled, but that they were not rusted. He added that neither of the legs on the side away from the draw works was rusted; that he cut up the derrick with an acetylene torch and saw no rust on it; that some of the braces were broken, and that they were all new breaks.

In consequence of being pinned down by one of the derrick legs, plaintiff suffered a broken back and a punctured lung. He is now permanently disabled from doing manual labor. Prior to his injury, plaintiff was earning $1.10 an hour. As to his monthly earnings, plaintiff testified: "Well, during the last part of the war we were working twelve hours a day, each one of us, because they were short of men. My check run up pretty high. Every fifteen days, about $225.00. Of course when they got plenty of help, they put on another crew and cut it down some. It would run about $200.00 then." He swore that his earnings were "a little better than $400.00 per month." He is now doing part time work in a filling station, earning about $90 a month. His injuries will be detailed later. Suffice it now to say that Dr. Tyner, a physician and radiologist who made examinations of plaintiff, testified that Allbritton should not pick up tires and that he shouldn't be working in a filling station at all. Dr. Barker, an orthopedic surgeon, testified that plaintiff's disability is permanent and total.

Defendant depends primarily upon the harsh rule established in Southern Oil Co. v. Church, 1903, 32 Tex.Civ.App. 325, 74 S.W. 797, which declares the existing Texas law concerning the duty of one who furnishes an instrumentality to be used by an independent contractor. That case has been cited numerous times by the Texas Courts of Civil Appeals, which have stated that it represents settled Texas law. For example, see North American Dredging Company v. Pugh, Tex.Civ.App., 196 S.W. 255, 256; and Pittman v. City of Wichita

Falls, et al. Tex.Civ.App., 120 S.W.2d 847. If the facts of the case at bar do not distinguish it from Southern Oil Co. v. Church, the defendant would be entitled to a judgment *non obstante veredicto*, inasmuch as there is no evidence that the defendant knowingly furnished a defective derrick to the Oil Production Co. However, it was emphasized in the Southern Oil Co. decision that the defendant retained *no control of any kind over the independent contractor in the performance of his work,* and that the oil company *had no control whatever over the plaintiff* who was an employee of the independent contractor. The opinion repeated that the Southern Oil Company "had no control or supervision over Hammil Bros. or their men at the time that the accident occurred." [32 Tex. Civ.App. 325, 74 S.W. 798] The court stated: "The oil company, however, by its contract with Hammil Bros., *reserved the right to exercise some control over Hammil Bros. when oil sand should be reached by the drill. This condition had not arisen at the time that the plaintiff was injured."* (Emphasis supplied.)

The defendant's attorneys stress the fact that the Court of Appeals for the Fifth Circuit has recognized that it is still the law of Texas that one who employs an independent contractor to do certain work owes the latter's employees only "the duty of exercising ordinary care not to furnish them appliances that are known by him to be inherently dangerous." Sun Oil Co. v. Kneten, 5 Cir., 164 F.2d 806, 809. Even so, it should be observed that, in the case cited, a judgment in favor of the employee of the independent contractor against the employer of the independent contractor was upheld. Furthermore, the Court of Appeals stated: "If the employer of the independent contractor reserves the right of supervision and control and the right to direct the manner in which the servants of the independent contractor perform their work, he is under the duty to exercise reasonable care for their safety * * *."

In the instant case, Myrick testified that he had almost complete control over Oil Production's crew. He gave the same kind of instructions to that crew as he had given

to his own crew; and no one else was authorized to give such orders. He gave detailed orders as to what Oil Production's crew was to do, such as when to pick up drill pipe and clean it out; to see if they could circulate; when to pull out of the hole, and when to put in El Paso Clay, Baroid and Aquagel. Cockrell, President of Oil Production, testified that his crew would obey all of Sunray's orders having to do with the work-over of the well, although they would obey the orders of Oil Production's supervisor as to matters concerning that company's machinery.

This control by Sunray over the Oil Production crew as to all matters pertaining to the work-over of the well indicates that Sunray retained control of the premises and the derrick. That Sunray retained control of the derrick is further evidenced by the fact that, when the inspection by Wyatt (Oil Production's man) and Myrick (Sunray's field superintendent) disclosed that the gin pole was bent, Sunray furnished a new gin pole. Another indication that Sunray retained control of the premises and the derrick is found in Myrick's testimony, when he said: "I only directed the operation of our well * * * I told them how much to pull on my pipe and derrick."

It is apparent from the working arrangement that the well and the derrick remained under the control of Sunray. From the Texas authorities, it seems clear that if an employer of an independent contractor retains control of the premises on which the work is carried on, he owes the duty to exercise reasonable care to keep the premises in a safe condition.

In Harbour v. Graham Mfg. Co., Tex. Civ.App., 47 S.W.2d 700, 702, the employee of an independent contractor was killed while working on premises which remained under the control of the employer of the independent contractor. In reversing a directed verdict for the defendant, the employer of the independent contractor, the Texas court held that in accordance with the general rule "the owner of the property who is the contractee of the work would not be absolved from the duty to exercise reasonable care and diligence to

conserve the safety of the person rightfully at work thereon, against dangerous conditions or instrumentalities in use on such premises."

In Foster Lumber Co. v. Rodgers, Tex. Civ.App., 184 S.W. 761, a lumber company allowed an employee of a railroad company to use its tramway to inspect ties delivered to the railroad company. The court held that the undertaking was mutual and for the benefit of all the parties. Therefore, the Foster Lumber Company was under obligations to plaintiff to use ordinary care to keep its tramway in a reasonably safe condition for him to pass over when performing the work.

The plain implication in West Texas Utilities Co. v. Renner, Tex.Com.App., 53 S.W.2d 451, is that the employer of an independent contractor who remains in control of the premises has a duty to exercise reasonable care to keep the premises in a safe condition.

The Supreme Court of Texas applied the same rule when it held that a railroad company which permits another railroad to use its tracks and yards, the owner of the tracks remaining in control of the yards, owes to the employees of the railroad using the tracks the duty of exercising reasonable care to keep the tracks in a safe condition. Missouri, K. & T. Ry. Co. of Texas v. Beasley, 106 Tex. 160, 177, 155 S.W. 183, 187, 160 S.W. 471. The court asserted that the Missouri, K. & T. Ry. Co. of Texas having furnished its tracks and yards at Winnsboro to the Marshall & East Texas Ry. Co., for the purpose for which it was being used by Beasley, the plaintiff, the Missouri, K. & T. Ry. Co. owed to the servants of the Marshall & East Texas Ry. Co. the same duty to furnish a safe place to work as it owed to its own servants.

The Texas Court of Civil Appeals applied this doctrine in Houston Belt & Terminal R. Co. v. Rogers, 44 S.W.2d 420. There, plaintiff, an employee of an iron works corporation was injured when the defendant railroad's crane, which he was using to load iron delivered by the railroad, overturned. In holding the defendant liable, the court stated that the railroad owed the same duty of care to plaintiff as if he

had been the railroad's employee. See, also, Hanson v. Ponder, Tex.Com.App., 300 S.W. 35; Moreman Gin Co. v. Brown et al., Tex.Civ.App., 291 S.W. 946; William Cameron & Co. v. Realmuto, 45 Tex.Civ. 305, 100 S.W. 194.

The defendant argues that the jury's findings as to special issues numbered 9 and 10 prevent the defendant from being liable on the theory that it retained control of the premises, including the derrick. The jury found, under these special issues, that the tool pusher of Oil Production Maintenance, Sam Colvin, had the authority and right of control over the means and manner of the performance of the work which was required of the plaintiff; and that Sunray's superintendent, Myrick, did not have such authority and right of control over plaintiff. Such a finding, however, in no way prevents the defendant from being held liable under the rule established by the Texas cases discussed above. In those cases, the plaintiff was an employee of some one other than the defendant; and the defendant had no right of control over the manner and means of work required of the plaintiff. Liability was imposed because defendant had control of the premises on which the plaintiff was working.

Thus, since Sunray Oil Corporation, defendant here, retained control over the premises and the derrick, it was bound to exercise reasonable care to maintain the derrick in safe condition for use; and a violation of this duty, if the proximate cause of plaintiff's injuries, would place liability upon Sunray. The findings of the jury, based upon substantial evidence, were that immediately prior to the collapse the derrick was defective (Special Issue No. 1); that Sunray, by the exercise of ordinary care, could have discovered such defective condition (Special Issue No. 2); that Sunray failed to exercise ordinary care to discover the defective condition (Special Issue No. 3); and that such failure was a proximate cause of the collapse of the derrick and the injuries sustained by plaintiff (Special Issue No. 4). The jury also found that Sunray failed properly to inspect and maintain the derrick prior to its collapse, and that such failure was a proxi-

mate cause of plaintiff's injuries (Special Issues, Nos. 5, 6, 7 and 8).

The only direct testimony that the derrick was defective was that of Bruce Allbritton, the plaintiff's brother. He testified that a metal plate on which rested the leg on the right side of the V-door, coming out, was rusty, that it was eaten up with rust, that in places you could stick a match through it; and that the metal plate was broken when he examined the fallen derrick. Everett Johnson testified that the legs buckled on the side which was being pulled on and that the legs were buckled on the draw works side.

■ For determination of the question whether there is evidence to support a verdict, the Texas rule has been thus stated: "If discarding all adverse evidence, and giving credit to all evidence that is favorable to the successful party and indulging every legitimate conclusion that is favorable to him, a jury might have found in his favor, then it is to be concluded that there is evidence to support the verdict." Traders & General Ins. Co. v. Scott, Tex. Civ.App.1945, 189 S.W.2d 633, 637, quoting 17 Tex.Jur. 910, with cases cited in footnote.

■ Therefore, if the jurors chose to disregard testimony that there were no defects in the derrick, and to give credit to Bruce Allbritton's testimony, the jury could reasonably find that the plate under the leg to the right of the V-door was rusted through, and that this plate was broken after the derrick had fallen; that the legs on the draw works side were buckled, and that the derrick fell over towards the draw works. From the fact that the plate on the leg by the V-door was broken and the derrick fell over the draw works, it would seem to be a reasonable inference that the pull by the draw works pulled upon the legs on the far side and that the plate holding one of these legs broke, causing the derrick to be pulled over. The buckling of the legs next to the draw works could have been due to the strain placed on them by the guy wires trying to hold the derrick straight up while the draw works pulled it over. If this is a reasonable inference, and it seems to be,

60

there was sufficient substantial evidence from which the jury could reasonably find that the rusty plate caused the derrick to fall.

The rule in Texas, long established, is that negligence to be held to be the proximate cause of an injury must have been of such character that the consequent injury would have been foreseeable to a reasonable person. East Texas Motor Freight Lines v. Loftis, Tex.Sup. 1949, 223 S.W.2d 613. In this case, there would seem to be little doubt that, if the plates holding the derrick were rusty and eaten through by rust, a prudent person in the exercise of reasonable care should have foreseen the danger of the derrick collapsing when heavy loads were placed upon it, with consequent injury to persons working around the derrick.

■ In the alternative, the defendant seeks a remittur of the damages awarded the plaintiff. The most that can be said for any rule established by the Texas cases on remittitur is that if the courts are convinced that the verdict substantially exceeds a rational appraisal of the damages, a remittitur will be ordered and, unless accepted, a new trial will be directed. In determining what is a rational appraisal of the damages, the Texas courts have compared the amount of the verdict with verdicts awarded and allowed to stand in similar cases. See Texas Rules of Civil Procedure, Rule 440, relating to remittitur.

Allbritton testified that, when hurt, he was earning $1.10 an hour; that because of the wartime shortage of labor he was working twelve hours a day and earning around $400 a month. However, it would seem that judicial notice should be taken of the fact that conditions are more normal today and that the forty hour work-week has generally come back. But, also, the reduced purchasing power of the dollar must be considered; and the life expectancy of the plaintiff is important in measuring his just compensation. No arbitrary mathematical formula may be reasonably

adopted. It is obvious, at least, that the plaintiff had, when injured, many working years at substantial pay in prospect. He testified that, at the time he was injured, he was in line for promotion.

Plaintiff's medical expenses, alone, for past treatment total $6,271.61. He has suffered much mental and physical pain and will continue to endure both mental and physical pain and suffering. He suffered a comminuted fracture through the body of the fourth vertebra, the vertebra being split into a number of fragments and compressed from above down. At times those splinters were mashed together and spread out. Quite a bit of the bone is shoved considerably forward toward the abdominal cavity, and the vertebral or spinal column above the point of break is also shoved forward. The vertebrae are separated an inch and a half from left to right. This condition is permanent. Part of the tibia was taken from plaintiff to make a bone graft across this fractured vertebra, to hold the backbone where it is. It cannot be brought back into alignment. Even with the bone graft, it would be very easy for plaintiff to break his back again if he took an ordinary fall. Should this happen, the shearing action on the nerves could cut them in two and paralyze plaintiff's legs.

In addition to the injuries to his spinal column, plaintiff's seventh, eighth and ninth ribs were fractured, the eighth being fractured in two places. His lung was punctured and collapsed so that plaintiff suffered what is called traumatic pneumonia, which is a serious condition. This has resulted in adhesion from the right lateral chest wall to the dome of the right diaphragm.

Plaintiff now has to wear a steel brace, and is unable to stand without it. Even with the brace on, he cannot reach down to pick up anything. He is permanently disabled from doing manual labor, and has had no training for other kinds of work, having completed only the fourth grade of school. For analysis of some of the important medical testimony, see footnote.[1]

1. Dr. W. E. Barker, a physician specializing in orthopedic surgery testified

that when he first saw plaintiff: "Mr. Allbritton was in rather severe surgical

Although the jury's verdict is a higher than customary award for such injuries, no Texas authority would seem to preclude the allowance of the amount fixed

shock. He had severe abrasions over his back; he had an enormous hematoma, a large collection of blood in the soft tissues on his back. He was having some difficulty with breathing." He stated that the effect of plaintiff's injury was this: "Mechanically he lost all support of his spinal column. This was absolutely flexible. He lost all support from the joints; there is nothing to prevent motion in any direction. You have complete displacement * * *. From a mechanical standpoint, if nothing is done, the man would be unable to stand erect."

Dr. Furman H. Tyner, physician and radiologist, who had X-rays of plaintiff's back and chest made by a technician under his supervision, testified as to his findings from these X-rays which were admitted as plaintiff's exhibits. From the X-rays made on March 11, 1947, he testified: "The findings in this case were fracture through the body of the fourth vertebra * * *. You see a large piece carrying with it the entire spinal column above is displaced over to the right. * * * The fractures are through the articular processes on the left and through the pedicle, that is the part that holds the backbone together, and another one through the superior process on the right of the fifth,. so that you have a fracture on the inferior process on the fourth and the superior process of the fifth, which allows the entire spinal column to be displaced to the right side. In addition, you have what we call a comminuted fracture of the body which is split into a number of fragments and compressed from above down. At times those are mashed together and spread out * * *."

Referring to an X-ray taken from the side, Dr. Tyner stated: "This represents the body of the fourth lumbar vertebra you just looked at in this position. It is crushed until there is very little of it left between the body above and one below. A good deal of the bone is shoved considerably forward toward the abdominal cavity, and the vertebral column or spinal column above the point of the break is also shoved forward."

The seventh, eighth, and ninth ribs were fractured, the eighth being fractured in two places. The X-rays of March 11, 1947, according to the doctor, also showed that the "lung has been punctured and has collapsed * * *. This white area represents an area of punctured lung in which there is hemorrhage. We call that a hemorrhage or

traumatic pneumonia * * *. It is a serious condition."

X-rays made on September 19, 1947, showed that "the position of those fragments has not changed. But he has a bone graft which has been laid down in a gutter made superiorly down across the site of the fracture * * * from the second [lumbar vertebra] across the third, fourth, fifth, and across the first sacral segment to bridge the fracture site. This bone graft is a small piece of bone about six inches long by three-quarters of an inch wide by the thickness of the cortex, which is less than a half inch, taken from the tibia of the same individual." The doctor further testified that the spinal canal is separated approximately one inch from its normal site; and that the vertebrae are separated an inch and a half from right to left. And the doctor stated that, from an X-ray taken six months after September 19, 1947, "the prognosis is that this condition is permanent."

The plaintiff introduced X-rays made on May 4, 1949, to examine the lungs, which Dr. Tyner interpreted as "showing again the adhesion from the right lateral chest wall to the dome of the right diaphragm." Plaintiff was then suffering from hemorrhage from the lung.

When questioned about the purpose of the bone graft, Dr. Tyner stated that it "is not to bring the backbone into alignment because that cannot be done. They are done to hold it where it is." As to the strength of the back after the bonegraft, Dr. Tyner testified that "it would be very easy to break that back through and have further displacement of it. * * * If he were to fall off a curb and hit in the street, which ordinarily would not break a back, if he fell on his flat of his back, it would easily fracture again. * * * There is danger to any structure in the spinal canal * * *. The nerves come out and go out through the intervertebral spaces or foramen at that point and any shearing action on those nerves could cut them in two and paralyze whatever muscles they supply."

In response to a question from the court as to the possibility of future improvement, Dr. Tyner stated: "As of today he should have reached his maximum improvement." Counsel then asked whether or not plaintiff's back would remain unconnected and out of line, to which the doctor replied that it would.

by the jury as reasonable compensation. After all, each case must be decided upon its own peculiar facts.

 After weighing all the evidence pertaining to plaintiff's severe and permanent personal injuries and after carefully considering the excellent briefs and astute oral arguments of counsel, the trial judge in the instant case cannot conscientiously reach the conclusion that the verdict is so excessive as in justice to require either a new trial or a remittitur of the damages which the jury has awarded the plaintiff.

Accordingly, the motions for judgment *non obstante veredicto*, for a new trial, and for a remittitur of the damages, are overruled.