## HOFFMAN v. HOUSTON CLINIC et al.
### No. 9558.

Court of Civil Appeals of Texas. Galveston.
June 10, 1931.

Rehearing Denied July 22, 1931.

W. J. Howard and E. T. Chew, both of Houston, for appellant.

King, Wood & Morrow and Sewell, Taylor, Morris & Garwood, all of Houston, for appellees.

LANE, J.

On and for some time prior to the 2d day of August, 1927, S. R. Hoffman, plaintiff in the suit hereinafter mentioned, was an employee of the Keen Wolf Oil Company, a "subscriber," as that term is used in the Workmen's Compensation Statute of Texas, who at such time held a policy issued by the United States Fidelity & Guaranty Company under the provisions of said compensation statute. While Hoffman was performing his usual duties for his employers, and while at labor in their machine shop, a piece of steel struck him in his left eye and lodged therein, and at about the same time and while he was engaged in his work a piece of brass lodged on the outer coating or layer of his eye. Immediately after he so suffered said injuries, he gave notice thereof to his employers. Upon receipt of such notice the employers of Hoffman, as they were authorized and required to do by the provisions of the law, procured medical aid for Hoffman, and in so doing they gave him an order written on a letterhead of the Houston Clinic, a copy of which is as follows:

"THE HOUSTON CLINIC
"Houston, Texas
"Main at Pease          Phone Hadley 4334
                    "(Connects All Departments)
"W. Burton Thorning, M. D.   A. Philo Howard, M. D.
"M. B. Stokes, M. D.         P. R. Cruse, M. D.
"James H. Agnew, M. D.       W. A. Clark, M. D.
"C. P. Harris, M. D.         Robt. A. Johnson, M. D.
"J. M. Robinson, M. D.       Joe B. Foster, M. D.
"J. Thos. Jones, M. D.       Jno. H. Wooters, M. D.
"F. H. Lancaster, M. D.      F. E. Dye, M. D.
"Robt. L. Harris, M. D.      C. M. Sublett, M. D.

"Ralf A. Graves, D. D. S.
"Date Aug. 2, 1927.

"Please render necessary treatment to S. R. Hoffman, who was injured while in our employ and (was) engaged in his regular occupation.

"We are insured by U. S. F. & G. Co.
"Sent by Keen & Wolf Oil Co.
"Per R. G. Hill.
"Present to Industrial Department."

Upon receipt of such order, Hoffman went to the office of the Houston Clinic and presented himself for treatment. He was there placed in charge of Dr. Griffey, an eye, ear, nose, and throat specialist, an employee of the Clinic, for treatment.

Upon Hoffman's first visit to the Clinic, Dr. Griffey examined his injured eye with a magnifying glass and found a small particle of brass on the eyeball, which he removed with a small pair of tweezers. The doctor then informed Hoffman that there had been a hemorrhage of the eyeball, but told Hoffman after the removal of the piece of brass that there was nothing else in his eye and that he could go back to work. Having received such information, Hoffman returned to his work the next day, and at about 3 o'clock p. m. his eye became so painful he went back to Dr. Griffey and told him of his pain. The doctor, using only the same instrument as he had used on the first examination, examined the eye and then told Hoffman in effect that the pain suffered by him amounted to nothing, whereupon Hoffman told the doctor that he was afraid there was something in his eye which had not been removed. In reply to such expressed fear, the doctor told Hoffman there was nothing left in the eye, that he could see entirely through it, and told Hoffman to go back to work and that it was not necessary for him to come back for further treatment. Hoffman's eye continued to pain him, and on the third day after his injury he went back to the doctor and told him that he was suffering great pain from his injured eye and that he was sure there was something else in the eye which he (the doctor) had not

found. The doctor then told Hoffman that it was not possible that anything was left in his eye which he had not discovered. Whereupon Hoffman asked the doctor what caused the eye to pain him so much, to which inquiry the doctor said: "You imagine it, there is nothing wrong with it, * * * for me not to worry, that it was his business to look after the eye." On the fourth day after the injury occurred the eye was still paining Hoffman and the vision was getting dim and he went back to the doctor and told him that his sight was becoming dim. Upon this fourth visit the doctor told Hoffman that such dimness was caused by medicine which he had put in his eye and that his eye was all right. Hoffman started to work on the fifth day after the accident occurred, but finding that he was unable to work he again went back to the doctor and on that visit the doctor made another examination of the eye and found that it was infected and after discovering such infection he, for the first time, took an X-ray of the eye and found that a piece of steel was embedded therein. After this piece of steel was discovered in the eye, Hoffman was sent to St. Joseph's Infirmary, where he remained for about five or six days, and later his eyeball was removed by Dr. Griffey and Dr. Slataper.

After the removal of his eye, Hoffman in due time and manner filed with the Industrial Accident Board of Texas his claim for the compensation provided by law for the loss of his eye. His claim was allowed by the Accident Board and an award of $1,750 was made to him, which was paid by the United States Fidelity & Guaranty Company, such sum being the full amount to which he was entitled under the provisions of the compensation statute.

Thereafter S. R. Hoffman brought this suit against the Houston Clinic, a copartnership, and against W. B. Thorning, A. P. Howard, M. B. Stokes, and P. R. Cruse, parties composing such copartnership, and against Dr. E. W. Griffey, to recover of such defendants jointly and severally the sum of $15,000.

The plaintiff alleged that the copartnership held themselves out as parties having skill and ability to practice medicine and surgery, and the skill, learning, and ability reasonably necessary to the diagnosis of diseases and injuries to the human eye and the treatment of such injuries and diseases; that Dr. Griffey was either a partner of the other defendants in the firm's business, or he was an employee of the firm engaged by the firm to assist in carrying on the practice of medicine, surgery, etc. He then substantially alleged the existence and truth of the matters and things stated by us in our preliminary statement. He further alleged as follows:

"That had the defendants, their agents, servants and employees exercised ordinary care and skill, they could have ascertained upon this plaintiff's first visit to them the location of said piece of steel in his eye, and the same could have been removed and this plaintiff would not have lost his eye. That by reason of the failure of the defendants to give this plaintiff the proper care and treatment this plaintiff has lost his entire eye and has had to have his eye removed and a glass eye substituted.

"That this plaintiff would have had his eye and would not have lost the sight of his eye, but for the following negligent acts and omissions, among others, on the part of defendants, their agents, servants and employees, all of which were a proximate cause of plaintiff losing his eye and sustaining the damages hereinafter alleged.

"(a) The defendants, their agents, servants and employees were negligent in failing to discover the piece of steel that so lodged in plaintiff's eye and in failing to remove the same from his eye upon his first visit to their office or place of business, as aforesaid.

"(b) The defendants, their agents, servants and employees were negligent in failing to take an X-ray picture of plaintiff's eye on the occasion of his first visit to their office, or place of business in order to ascertain whether or not any steel remained in plaintiff's eye.

"(c) The defendants, their agents, servants, and employees were negligent in failing to advise the plaintiff to have an X-ray picture of his eye taken on the occasion of his first visit to their office to ascertain whether or not any steel or other foreign substance remained lodged in plaintiff's eye, his eye being lacerated at the time.

"(d) The defendants, their agents, servants, and employees were negligent in failing to take an X-ray picture of plaintiff's eye until five days after the piece of steel had entered his eye and when plaintiff's eye had become infected, if he had not already lost the sight of his eye, his eye and the sight thereof could have been saved if the defendants, their agents, servants and employees had taken an X-ray picture immediately upon plaintiff's first visit to their office and discovered the steel which had lodged in his eye and removed same, but this they negligently failed to do.

"(e) The said defendants, their agents, servants, and employees were negligent in not advising the plaintiff to have an X-ray picture of his eye taken before the same became infected in order that the steel in his eye would be discovered and removed before infection of the eye began and infection of his eye thereby prevented and the sight of his eye saved.

"(f) The defendants, their agents, servants, and employees were negligent in failing to make a proper examination of plaintiff's eye at the time of his first visit to their office, and before the same had become infected, by

the use of methods and instruments other than the X-ray that could have been used or adopted and which the defendants in the exercise of ordinary care should have used or adopted in endeavoring to discover the condition of plaintiff's eye and the steel that had become lodged therein.

"(g) The said defendants, their agents, servants, and employees were negligent in not bandaging plaintiff's eye on his first visit to their office and in not taking such precaution as in the exercise of ordinary care they should have taken on such occasion to prevent plaintiff's eye from becoming infected; it appearing that plaintiff's eye was lacerated at the time and if same had been properly bandaged, or other reasonable precaution had been taken by the defendants to prevent the infection of his eye the same would not have become infected, as it did become infected, which resulted in the loss of plaintiff's eye.

"(h) The said defendants, their agents, servants, and employees were negligent in not keeping the plaintiff under observation after he went to them for treatment and they undertook the treatment of his eye and in not examining his eye at such intervals as was required by the exercise of ordinary care to determine the condition of the eye and to properly treat the same.

"Plaintiff would further show that prior to said loss of his eye, he was a refinery pumper and capable of earning a large sum of money. per month, but that since the loss of his eye he is unable to continue his said occupation, and is debarred by and blacklisted in nearly all large refineries and prevented from working therein on account of the loss of his eye, and he is prevented from obtaining employment and his ability to obtain employment has been greatly restricted and limited and it is now, and will be throughout his life, very difficult for him to obtain employment, and he is unable to earn the amount of money that he formerly did.

"That by reason of the said negligence of the defendants hereinbefore alleged, plaintiff was caused to suffer and did suffer intense and excruciating pain and great mental anguish and his said eye had to be taken out and removed, and he is in danger of his remaining good eye becoming affected and his earning capacity has been greatly reduced and his ability to work and earn money is much less than it would have been, but for the said negligent acts of the defendants resulting in the loss of his eye, and plaintiff's face has been marred and disfigured causing him great humiliation and great mental anguish, by reason of the foregoing plaintiff has been damaged in the sum of Fifteen Thousand ($15,-000.00) Dollars."

Defendants answered by general demurrer, general denial, and specially alleged:

"That the plaintiff received an injury while an employee of Keen & Wolf, who were subscribers under the terms and provisions of the Employers' Liability Act of the State of Texas, and that the insurer, United States Fidelity and Guaranty Company, issued to said Keen & Wolf its compensation policy of insurance and that by the terms thereof the said company became bound and obligated to compensate plaintiff for all injuries received by him in his said employment; that the loss of plaintiff's eye was proximately the result of the injury which he received while in the employ of Keen & Wolf; that he had received compensation for the loss of his eye from the United States Fidelity and Guaranty Company and that such compensation was accepted by him in full settlement and satisfaction of his injury; that after he had sustained his injury while in the employ of Keen & Wolf, said Keen & Wolf authorized and directed him to go to the defendants for medical treatment and that he did so and that the defendants administered such medical treatment, and in so doing acted as the agents, servants and employees of Keen & Wolf; that in the selection of defendants to provide such treatment Keen & Wolf exercised care and prudence."

By supplemental petition the plaintiff denied all allegations of defendants' answer, except such as he expressly admitted. He admitted he was an employee of Keen & Wolf; that they were subscribers, as alleged in defendants' answer, and that the insurer, United States Fidelity & Guaranty Company, paid, him $1,750 as compensation for the injury he received in said employment. He also alleged that said insurer had failed and refused to prosecute suit against the defendants on account of the negligent acts set up in plaintiff's first amended original petition. He denied that Keen & Wolf furnished him medical treatment, and denied that defendants were the agents, servants, and employees of Keen & Wolf, and alleged that if they were such agents, servants, and employees in any sense they were not such within the meaning of these terms as used in the statute of the state of Texas known as Workmen's Compensation Law.

A jury was impaneled and sworn to try the case, and the evidence heard. The facts stated in our preliminary statement were shown by the evidence.

Dr. L. M. Ellis, who qualified as an eye, ear, and nose specialist, called by the plaintiff as a witness, testified that the proper method of determining the condition of the eye when the patient had a piece of brass lodged on the outer coating of the eye and there was a laceration of the eyeball was to make a complete examination of the eye, using the ophthalmoscope and X-ray to see if anything had entered the eye, and that such was the treatment generally recognized by practitioners in the community engaged in the practice of that branch of medicine which deals in

determining injuries to and diseases of the eye; that his school of medicine under such circumstances and conditions taught that the X-ray, ophthalmoscope, and magnet should be used in determining the condition of the eye and whether or not a piece of metal or other foreign body had lodged in the eye; that the well-recognized tests and those generally used by eye specialists in this community in determining whether any metal or foreign substance had lodged in the eye are the X-ray, ophthalmoscope, and magnet; that if a small piece of steel has entered the eyeball or has penetrated the outer coating of the eye and is lodged in the eye, a good X-ray picture should show it, and that the X-ray and ophthalmoscope should be used, and that his school of medicine so taught; that a lacerated eyeball or a laceration of the outer coating of the eye should cause one to suspect that a piece of metal or other foreign substance had entered the eye, and that under such circumstances his school of medicine teaches that to best preserve and protect the eye an X-ray picture of the eye should be taken and the ophthalmoscope and magnet test used and, if anything is found, to remove it; that when a patient goes to an eye specialist complaining there is something in the eye and the physician removes a piece of brass from the outer coating of the eye and sends the patient away and the patient returns the next day complaining of severe pain in his eye, that he would re-examine to see if there was some foreign body still in the eye, and that a physician or eye specialist under such circumstances should re-examine the eye and have X-ray pictures made again to be sure as possible that nothing was still in the eye, and that his school of medicine taught such practice; that, assuming the patient returns to the physician again on the third day still complaining of pain in his eye, a complete re-examination should be made with further X-ray pictures, and if the patient has been working, to stop him at once and X-ray the eye again and have consultations; that such is the practice recognized in the treatment of the eye under such circumstances by physicians in this vicinity and also the practice "taught by our school of medicine"; that any foreign body lodged in the eye was very dangerous to the eye and the longer it remains the greater the danger, and also that the tendency of a piece of steel in the eye was to work more deeply in the eyeball; that the eye will cause the steel to change position, which in turn will produce irritation of the eye, and that the prompt removal of steel will reduce the danger to the eye from 20 per cent. to 50 per cent.; that infection is always dangerous to the eye, and that the prompt removal of a small piece of steel that has lodged in the eye would greatly diminish the probability of infection of the eye; that had the steel been removed on the first day, the chances for saving the vision would have been much greater;

and that if the piece of steel had been removed on the second day there would have been a probability of saving the vision of the eye, in his opinion, but with each day and each hour the chances got less.

Dr. Edward W. Griffey, one of the defendants, who was appointed by the Clinic to take charge of the plaintiff for the purpose of treating his injured eye, testified that he was 33 years of age and that he was engaged in the practice of medicine as an employee of the defendants, W. Burton Thorning, A. Philo Howard, M. B. Stokes, and P. R. Cruse, by whom he was employed since January, 1927; that his practice was limited to the eye, ear, nose, and throat; that he was so employed by the other defendants on August 2, 1927; that he belongs to the regular or Allopathic School of Medicine; that he had practiced medicine since June, 1924; that he had been practicing as a specialist in diseases of the eye since 1926; that Mr. Hoffman, the plaintiff, came to him for treatment on August 2, 1927; that he received first aid and returned on several occasions thereafter for treatment; that three or four days after first aid he developed pain, which was out of proportion to local eye findings, and an X-ray film was taken which revealed the presence of an intraocular foreign body; that with the assistance of Dr. F. J. Slataper the foreign body was removed under ether anesthesia; that the operation consisted of making an incision through the eyeball and by means of an electromagnet a director was inserted and the foreign body was extracted; that when plaintiff came to him for treatment a small splinter of brass was lifted from the outer coating of the eyeball; that he did not use either the X-ray or the magnet when Mr. Hoffman first visited him for treatment; that he first discovered that a piece of steel had entered Mr. Hoffman's eye and lodged therein three or four days after he came in for first aid; that he discovered it by X-ray examination, by having an X-ray test made; that it is the proper practice, and that his school of medicine so teaches, that when a patient comes to a physician with a laceration on his eyeball, that some examination should be made to determine whether there is any steel or brass or other foreign substance that has entered the eye through such laceration and lodged therein, where a laceration to the eyeball is present, and when other signs of intraocular damage are found, the history is important; that one of the well-recognized methods for making such determination is the use of the X-ray; that the X-ray should be used under such circumstances to make such determination, when as indicated by the presence of other clinical signs of intraocular damage.

Further testifying he said: "In my opinion, the cause of Mr. Hoffman losing the sight of his eye was infection following the foreign body which was carried into his eye at the

time of the injury. With reference to your question, what tests, other than the use of the X-ray, would have discovered to me, on the occasion of Mr. Hoffman's first visit to my office, that a piece of steel had lodged in his eye, my answer is 'no other' and the X-ray method of determining the presence of a piece of steel was used when and as indicated; that the piece of steel removed from plaintiff's eye was 1x1x1½ millimeters."

Mrs. Hoffman, wife of the plaintiff, testified in effect that Dr. Griffey told her that he had made a mistake in the treatment of the plaintiff's eye; that he said: "We all 'make mistakes."

At the close of the evidence, the court, upon the motion of defendants therefor, gave an instruction to the jury to return their verdict for defendants. Such verdict was returned and judgment accordingly rendered. The plaintiff has appealed.

■ As reasons for the reversal of the judgment, appellant insists that the evidence clearly showed that appellees, the members of the Clinic, a copartnership, their agents, servants, and employees, were negligent in the treatment of the injured eye of appellant, which negligence resulted in and was a proximate cause of the entire loss of appellant's eye, and therefore the court erred in instructing a verdict for defendants upon any theory, especially upon the fact that the United States Fidelity & Guaranty Company, the insurer of Keen & Wolf, paid appellant the full amount allowed to him for the loss of an eye by the compensation statute, and therefore he was not entitled to any recovery from appellees, who were erroneously held by the court to be agents, servants, and employees of Keen & Wolf, the employers of appellant, as those terms are used in section 3 of article 8306, Revised Civil Statutes of 1925, which provides that employees of a subscriber "shall have no right of action against their employer or against any *agent, servant or employee* of said employer for damages for personal injuries, * * * but such employees * * * shall look for compensation solely to the association [the insurer]." (Italics ours.)

We think the contention of appellant should be sustained. The evidence shows, and Dr. Griffey practically admits, that he was guilty of negligence in the treatment of the eye of appellant. The evidence clearly raised the issue as to whether such negligence was a proximate cause of the loss by appellant of his eye. Such being true, the court could not reasonably have instructed the verdict upon the theory that the evidence did not raise such issue. So, then, the instruction of a verdict for the defendants was no doubt based upon a finding by the court that, since appellant had collected from the insurance company the full amount allowed by the compensation statute for the loss of an eye, he could

not recover in this suit, or upon a finding that appellees in treating appellant on account of his injury were acting as agents, servants, and employees of the subscribers, Keen & Wolf, and therefore appellant could not, under the express provision of the compensation statute, collect any sum from appellees by reason of their negligence, in that by the express provisions of section 3 of article 8306 the agents, servants, and employees of the subscriber cannot be held liable for injuries suffered by another agent, servant, and employee of such subscriber while acting within the scope of his employment, or upon both of such findings. An instruction for defendants based upon either of such findings was erroneous.

■ The fact that the United States Fidelity & Guaranty Company, the insurer of appellant's employer, had, under the provisions of the Workmen's Compensation Law, paid appellant the full sum allowed by such law for the loss of his eye, would not bar him from a recovery for damages suffered by him in excess of the compensation allowed by law which were inflicted upon him by a third party, that is, a party who was neither his employer, nor an agent, servant, or employee of such employer. That appellant would have a right of recovery for such excess injuries suffered by him by reason of the negligence of defendants, they being third parties as above defined, is, we think, well settled. William Cameron & Co. v. Gamble (Tex. Civ. App.) 216 S. W. 459; Galveston-Houston Electric Ry. Co. v. Reinle (Tex. Civ. App.) 264 S. W. 783, 789; G., H. & S. A. Ry. Co. v. Wells (Tex. Civ. App.) 15 S.W.(2d) 46, 53 (writ of error refused); Hanson v. Ponder (Tex. Com. App.) 300 S. W. 35; Lancaster v. Hunter (Tex. Civ. App.) 217 S. W. 765; articles 8306–8309, Revised Civil Statutes of 1925, as amended (Vernon's Ann. Civ. St. arts. 8306–8309).

In the case of Galveston-Houston Electric Ry. Co. v. Reinle, supra, it was clearly held that a "third party," as herein defined, who causes an injury to an employee of a subscriber, may be sued by such injured employee notwithstanding he had received compensation allowed by the workmen's compensation statute. It is then said: "The act evidently contemplates that the injured employee is the real beneficiary in cases where the damages exceed, as may often happen, the amount received by the employee from the idemnifying association."

In the case of Railway Company v. Wells, supra, it is said: "It is now well-settled law that, when an employee's representatives accept compensation for death under the Workmen's Compensation Statute (Rev. St. 1925, arts. 8306–8309), they are not precluded from recovering against negligent third persons, though the compensation insurance company which carried the risk refuses or fails to prosecute such suit; that the right of the insurer

to be subrogated to rights of the representatives of the deceased employee is for the insurer's benefit to the extent of sums advanced to such representatives; and that any excess of any recovery had in such suit is to be for the benefit of such representatives."

The finding of the trial court that defendants, appellees here, were either the "servants," "agents," or "employees" of Keen & Wolf, as those terms are used in section 3 of article 8306 of the workmen's compensation statute, if such was made, cannot be upheld.

Defendants in the present case were not the "agents," "servants," or "employees" of Keen & Wolf, as those terms are used in the statute. Accepting the definition of "independent contractors" as stated almost universally by all courts, defendants were independent contractors in rendering treatment to appellant.

In 14 R. C. L. p. 67, the author defines an "independent contractor" as "one who, exercising an independent employment, contracts to do a piece of work according to his own method, and without being subject to the control of his employer except as to results of his work."

Again, at page 68, it is said: "The control of the work reserved in the employer which makes the employee a mere servant is a control, not only of the result of the work, but also of the means and manner of the performance thereof. Where the employee represents the will of the employer as to the result of the work, but not as to the means or manner of accomplishment, he is an independent contractor."

Again, on page 76, it is said: "For example, a doctor employed to make an examination of a third person is said to be distinctly free from control or direction of his employer and is not a mere servant." Many authorities are cited in support of the author's statements.

In 31 Corpus Juris, p. 473, it is said that generally the term "independent contractor" "signifies one who, exercising an independent employment, contracts to do a piece of work according to his own method, and without being subject to the control of his employer, except as to the result of the work, and who has the right to employ and direct the action of the workmen, independently of such employer and free from any superior authority in him to say how the specified work shall be done; * * * one who undertakes to produce a given result without being in any way controlled as to the method by which he attains that result."

The author cites cases from many states, wherein the term "independent contractor" is defined as "one who, as an independent business, undertakes to do specific jobs of work, without submitting himself to control as to

the petty details." Carlson v. Stocking, 91 Wis. 434, 65 N. W. 58, 59. "One who, exercising an independent employment, contracts to do a piece of work according to his own method, and without being subject to the control of his employer." Bouvier, L. D. (quoting U. S. Fidelity, etc., Co. v. Lowry [Tex. Civ. App.] 231 S. W. 818). Other cases cited giving substantially the same definition are Hudgins v. Hann (C. C. A.) 240 F. 387; Green v. Soule, 145 Cal. 96, 78 P. 337; Scharff v. Southern Construction Co., 115 Mo. App. 157, 92 S. W. 126; St. Louis Ry. Co. v. Gillihan, 77 Ark. 551, 92 S. W. 793; Messmer v. Bell, etc., Co., 133 Ky. 19, 117 S. W. 346, 19 Ann. Cas. 1; and cases there cited; Kampmann v. Rothwell (Tex. Civ. App.) 107 S. W. 120. Cases holding to the same effect are from Michigan, Minnesota, North Carolina, Illinois, and other states.

Applying the definition given by the cases mentioned, it is clear that defendants were neither "agents," "servants," nor "employees" of the employer of appellant, as those terms are used in section 3 of article 8306 of the compensation statute. Clearly, then, the court erred in holding that appellant had no right of recovery in the present case upon a finding that defendants were the agents, servants, and employees of appellant's employer.

Having reached the conclusion, as above expressed, that the court erred in instructing a verdict for appellees, the judgment rendered is reversed and the cause is remanded.

Reversed and remanded.