## SUNRAY OIL CORPORATION v. ALLBRITTON.

No. 13148.

United States Court of Appeals
Fifth Circuit.

Feb. 15, 1951.

Holmes and McCord, Circuit Judges, dissented.

476

C. E. Bryson, Ben H. Rice, III., Houston, Tex., Angus G. Wynne, Philip Brin, Longview, Tex., Edward Howell, Oklahoma City, Okl., Gene M. Woodfin, Houston, Tex., for appellant.

J. Edwin Smith, George E. Cire, Houston, Tex., for appellee.

Before HUTCHESON, Chief Judge, and HOLMES, McCORD, BORAH, and RUSSELL, Circuit Judges.

HUTCHESON, Chief Judge.

For a statement of the issues and pertinent facts in this case, we refer to the opinion of the trial court, which is reported in D.C., 88 F.Supp. 54. We agree with the lower court's holding: that, if Sunray retained control over the premises and the derrick, it was bound to exercise reasonable care to maintain the derrick in safe condition for use; and that there was substantial evidence to support its finding that Sunray did retain such control. We agree, too, with its holding: that there was substantial evidence to support the jury's findings, that Sunray failed to exercise such care and that such failure was the proximate cause of the collapse of the derrick and the injuries sustained by the appellee.

The crucial question as to liability on this appeal is whether the appellant retained control of the derrick at the time of its fall. Neither side requested an instruction to the jury for a special verdict on this particular point; the court gave none; and the jury made no finding thereon. There was a finding by the jury that the derrick was defective immediately prior to its collapse, and that its defective condition could have been discovered by appellant by the exercise of ordinary care, which it failed to do, and which failure was a proximate cause of the derrick's falling. There were also findings that, at the time of the collapse and immediately prior thereto, the contractor had, and the contractee did not have, control over the means and manner of performance of the work which was required of appellee.

The court below rejected appellant's contention that the jury's finding as to who had control over the means and manner of performing the work prevented it from being liable on the theory that it retained control of the derrick. The court held that such finding had reference only to the dispute as to whether Allbritton was employed by the appellant or the contractor; and the jury found that he was not employed by appellant. No special finding by the jury having been made or requested on the particular issue as to control of the derrick, the trial judge was empowered to make it under Rule 49(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. By failing to request such finding by the jury, each party waived the right to a trial thereof by jury. On this point, said Rule 49(a) further provides as follows: "As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict."

It is contended by the appellee that he was a business invitee under the derrick and on the premises of appellant; the latter admitted in its responsive pleading that appellee "was either an employee or an invitee of the defendant as alleged by plaintiff." It is obvious from this that admittedly Allbritton was either an em-

ployee or invitee of the appellant. The jury found that he was not an employee; the trial court found or is deemed to have found that he was an invitee. Allbritton was not required to work on the derrick; he himself did not use it; and his work in no way affected it. He was required to handle only tools as distinguished from machinery. At no time did he go upon the derrick, though he was required to be at a point which put him in danger of being hit by it if it fell. Other independent contractors were performing work for Sunray under the derrick at the time it fell, and the latter's superintendent at the same time was supervising the whole operation. The trial court's finding, that Sunray had not surrendered control of the derrick to appellee's employer, is supported by substantial evidence and should not be set aside as clearly erroneous. It appearing from the working arrangement that the derrick remained under the control of appellant, and the appellee being an invitee as aforesaid, it follows that appellant was under the legal duty to exercise ordinary care to keep the premises, including the derrick, in a reasonably safe condition for appellee's use.

Finding no reversible error in the record, we, therefore, affirm the judgment, except as to the recovery of $13,084.70, which had been paid to Allbritton by the workmen's compensation insurance carrier, and which Allbritton had sought to recover on its behalf. Though it was the real party in interest, with the right to sue therefor, it was not a party to this suit, having failed and refused to prosecute it against appellant. Instead, it sought to recover without suing by agreeing with appellee that, if he would bring the suit, he could recover, and hold for it, all sums that it was entitled to recover against de-fendant by virtue of its subrogation rights under the laws of Texas. Appellee accordingly prayed that he recover and hold said sums as trustee, but this he could not do. He was not the trustee of an express trust in the sense of Rule 17(a), which provides that every action shall be brought in the name of the real party in interest but that the trustee of an express trust may sue in his own name without joining with him the party for whose benefit the action is brought. Moreover, it is now settled by the Texas law that the employee's right to recover against third persons is limited to damages in excess of the compensation paid to him.[1]

The judgment is, therefore, reformed by reducing it by the sum of $13,084.70, and, as reformed, is Affirmed.

Reformed and affirmed.

HOLMES and McCORD, Circuit Judges, dissenting.

HOLMES, Circuit Judge (dissenting).

The moderated verdict is manifestly excessive, in my opinion, and the judgment entered thereon should not be affirmed unless the excessive portion be fully remitted by the appellee. Heretofore it has been well settled in federal jurisprudence that general excessiveness in verdicts in actions for personal torts was a question for the trial courts, and that appellate courts lacked jurisdiction in such matters.[1] The earliest of these cases, and the prototype of them all, is Parsons v. Bedford, 3 Pet. 433, 7 L.Ed. 732, wherein the appellant complained of the trial court's refusal to order the clerk to record the testimony, which might have established an error of the jury upon an issue of fact. The Supreme Court held the assignment immaterial for the reason that the Seventh Amendment

---

1. Texas Employers Ins. Ass'n v. Brandon, 126 Tex. 636, 89 S.W.2d 982; Wm. Cameron & Co. v. Gamble, Tex.Civ.App., 216 S.W. 459; Hanson v. Ponder, Tex.Com. App., 300 S.W. 35, 40; Mitchell v. Dillingham, Tex.Civ.App., 22 S.W.2d 971, 972; Pedigo & Pedigo v. Croom, Tex.Civ. App., 37 S.W.2d 1074, 1076; Hoffman v. Houston Clinic, Tex.Civ.App., 41 S.W.2d 134, 138; Hartford Accident & Indem-nity Co. v. Week's Drug Store, Tex.Civ. App., 161 S.W.2d 153, 155; Traders & General Ins. Co. v. West Texas Utilities Co., 140 Tex. 165, 165 S.W.2d 713, 715. See also Art. 8307, R.C.S. of Texas 1925, Vernon's Ann.Civ.St. art. 8307. Cf. Jordan v. Collier, Tex.Civ.App., 223 S.W.2d 544, 548.

1. See Appendix, Comment 1.

prohibited its re-examination of such matters where the issues were tried by a jury. The decision of this constitutional question was not necessary to the disposition of the case, because under Section 22 of the Judiciary Act of 1789, no reversal upon writ of error was permissible in the Supreme Court for any error of fact. 1 Stat. 84, Chap. 20, Sec. 22, 2 Stat. Chap. 40, Sec. 2, p. 244, 18 Stat. Chap. 80, Sec. 1, p. 318, R.S., Sec. 1011, 36 Stat. Chap. 231, Sec. 291, p. 1167, 28 U.S.C. (1940 Ed.), Secs. 879 and 880. [See revised 28 U.S.C.A. § 2105, and note preceding § 1].

When writs of error were abolished and appeals substituted therefor, it was expressly provided that appeals from the district courts should be subject to the same rules, regulations, and *restrictions*, as were previously prescribed in law in cases of writs of error. Title 28 U.S.C. (1940 Ed.) 880. The Judiciary Act of September 24, 1789, was adopted nearly twenty-seven months before the Seventh Amendment became effective. The language of the statute forbidding reversals upon writs of error for any error in fact was without limitation or qualification, whereas the applicable language of the Seventh Amendment prohibits re-examination of any fact tried by a jury only otherwise "than according to the rules of the common law."

This statutory limitation on the power of federal appellate courts, except as modified by Rule 52, remained in effect until September 1, 1948, when it was repealed by the new Judicial Code. The reason for its repeal is immaterial, because the evident fact is that there was no intention on the part of Congress or the Revisors of the code to extend the scope of appellate judicial review beyond the limits prescribed by the Seventh Amendment. Consequently, it is plain that this Amendment is the only barrier to the present power of appellate federal courts, in cases of excessive verdicts, to call upon the plaintiff to enter a remittitur or suffer a reversal of the judgment; and whether it is any such barrier depends upon the rules of the common law on December 15, 1791. Therefore, a re-examination of the foundation upon which rests the classic dictum in Parsons v. Bedford is now appropriate.

That the trial court has jurisdiction to call on the plaintiff for a remittitur, without curtailing the function of the jury, is conceded in both the majority and dissenting opinions in Dimick v. Schiedt, 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603. See also the scholarly opinions in Slocum v. N.Y. Life Ins. Co., 228 U.S. 364, 365, 33 S.Ct. 523, 57 L.Ed. 879. Why, then, may not an appellate federal court exercise the same power when the amount of the verdict is clearly excessive? The advantages of such procedure are generally recognized, Northern Pacific R. R. Co. v. Herbert, 116 U.S. 642, 646-647, 6 S.Ct. 590, 29 L.Ed. 755; Arkansas Valley Land & Cattle Co. v. Mann, 130 U.S. 69, 74, 9 S.Ct. 458, 32 L.Ed. 854; the defendant is not prejudicially affected by a reduction of the amount adjudged against him; the plaintiff is merely given the option to have a new trial or to accept the maximum recovery that the court has determined may be allowed; and in either event no one will have been denied a trial by jury according to the rules of the common law.

No greater champion of the common-law right of trial by jury ever lived than William Blackstone. He called the jury system the glory of the common law, but thought it could not survive unless the misbehavior of jurors was subject to moderation by the judges. Blackstone's Commentaries had a wide circulation in America at the time of the Constitutional Convention. It is said that sixteen signers of the Declaration of Independence knew the book from cover to cover. A source book of legal science, a landmark in law and literature, it is safe to say that its contents were familiar to every American lawyer in public life in 1789 and 1791. There have been 73 editions of it in English, 56 in French, 11 in German, 9 in Italian, and one in almost every other language, including the Chinese.[2] According to these Commentaries, the Court of King's Bench had appellate jurisdiction over the Court of

---

2  See Appendix, Comment 2

Common Pleas and all inferior courts of record. Blackstone cites authorities upon which, he says, Chief Justice Glynn, in 1665, grounded the first precedent for granting a new trial upon account of excessive damages given by the jury; "apprehending, with reason, that notorious partiality in the jurors was a principal species of misbehavior." Book III, pp. 388, 389, 390. Coke said that the King's Bench had jurisdiction to correct all manner of errors in fact and in law of all the judges and justices of the realm.[3] In 1786, in King's Bench, Lord Mansfield said there was no doubt but that the court had the power to take the opinion of a second jury where the damages were excessive.[4]

If every verdict were final in the first instance, said the great Commentator, it would tend to destroy the valuable method of trial by jury, and would drive away from the common-law courts all causes of consequence to be decided upon depositions. "The jury," he said, "are to give their opinion instanter; that is, before they separate, eat, or drink. And under these circumstances the most intelligent and best-intentioned men may bring in a verdict which they themselves upon cool deliberation would wish to reverse." In a note, he cites Bracton to the effect that if the jury shall have erred, and the justices have pronounced judgment according to their verdict, they pronounce a false judgment; and therefore ought not to follow up the verdict but should amend it by a careful examination, but if they cannot decide it, it shall be referred to a higher tribunal.[5] At that time, the motion for a new trial preceded the entry of judgment, which was not entered upon the verdict as a matter of course, nor at all until after the first four days of the next term after trial; and the judges did not think themselves warranted to pronounce a false judgment. Not only did the court of original jurisdiction have power to order a conditional remittitur, and were under a duty to amend an excessive verdict, but

if they failed to do this, "or could not decide it," as Bracton said, "it was referred to a higher tribunal." Bracton's treatise, compiled between 1250 and 1256, is regarded as incomparably the best work of its kind produced by any English lawyer in the middle ages.

Blackstone read the opening of his Vinerian Lectures on October 25, 1758. He said that the King's Bench was a court, the jurisdiction of which was very high and transcendent; that it kept all inferior jurisdictions within the bounds of their authority, either by removing their proceedings to it or prohibiting their progress below; that it was likewise a court of appeal into which might be removed, by writ of error, all determinations of the Court of Common Pleas, and all other inferior courts of record in England; but that even this so high and honorable court was not the court of last resort, for its determinations might be removed by writ of error into the House of Lords or the Court of Exchequer Chamber, as the case might happen to be, according to the nature of the suit, though the Court of Exchequer and the Court of Common Pleas were inferior to the Court of King's Bench. The Court of Common Pleas was styled by Coke as the lock and key of the common law; yet a writ of error, in the nature of an appeal, lay from the Common Pleas to the King's Bench, the whole judicial authority of which was "said to be in the mouth of the judges." Gavit's Blackstone, p. 542. Blackstone quotes Bracton as fully expressing the dignity and power of the Court of King's Bench when he says that the justices of this court are chief, general, perpetual, and elder, accompanying the king, who are appointed to redress the injuries and correct the errors of all others. Book III, pp. 41–43; Lewis' Ed. of Blackstone, pp. 1054–1057.

At common law the motion for a new trial was a remedy in the nature of an appeal from the verdict of the jury, which in its origin was a substitute for the writ of attaint, which in turn succeeded the

---

3. See Appendix, Comment 3.

4. See Appendix, Comment 4.

5. See Appendix, Comment 5.

right of appeal to trial by battle.[6] On account of it, the writ of attaint was totally laid aside because experience proved that it was the "shortest, cheapest and most effectual cure for all imperfections in the verdict." Book III, p. 393; Lewis' Blackstone, pp. 1350, 1351. Like the earlier inferior courts of the United States that exercised both original and appellate jurisdiction, the King's Bench was presided over by one or more judges, who sat together in courts that were mutually connected and "were interchangeably courts of appeal or advice to each other." III Blackstone, p. 356; Gavit's Blackstone, p. 675; Lewis' Blackstone, p. 1317. The old district courts of the United States which exercised circuit court jurisdiction did not distinguish in their proceedings whether they sat as a circuit or a district court. This was determined by the nature of the proceedings and the character of the judgments. Southwick v. Postmaster General, 2 Pet. 442, 7 L.Ed. 479.

The contention that procedure by remittitur in federal appellate courts is inhibited by the Seventh Amendment is contrary to the teachings of Ashton, Bracton, Fleta, Glynn, Coke, Mansfield, and Blackstone, as to the rules of the common law of England; and in conflict with the opinions of Hughes, Holmes, Stone, Brandeis, Cardozo, and Rutledge, as to the scope and essential purposes of the Seventh Amendment. It is likewise in conflict with the opinion of the Supreme Court in Galloway v. United States, 319 U.S. 372, 390, 63 S.Ct. 1077, 87 L.Ed. 1458; with the spirit of Rule 50(b) of the Federal Rules of Civil Procedure; with decisions of the Sixth and Ninth Circuits; and with the actual decision of the Supreme Court in Kennon v. Gilmer, 131 U.S. 22, 9 S.Ct. 696, 33 L.Ed. 110, the final disposition of which it is impossible to reconcile with the Seventh Amendment except upon the basis that the decision implies the constitutionality of appellate exercise of the procedure by remittitur, it being expressly held therein that the Seventh Amendment was in full force in the Territory of Montana.

In 26 Yale Law Journal 49, the writer admits, p. 57, that Blackstone is quite accurate in saying "if any defect of justice happened at the trial by surprise, inadvertence, or misconduct, the party may have relief *in the court above* by obtaining a new trial." See also note 13, p. 57, of the same article; Vol. 1, p. 111, of Univ. of Chicago Law Review; 98 Penn. Law Review 575, 578.

An alternative to procedure by remittitur is to scan the record more closely for error, and reverse the judgment that but for the excessive verdict should be affirmed. In Home Ins. Co. of New York v. Tydal Co., 5 Cir., 152 F.2d 309, 311, this court said: "The trial judge alone has the right and duty to set the verdict aside if dissatisfied with it. The most an appellate court can do, if it thinks the verdict is not according to the weight of the evidence, is to scan the trial more closely for error." Thus, a fact tried by jury would be re-examined otherwise than according to the rules of the common law, which took a more direct and less specious approach to the problem. At common law, according to Bracton, Blackstone, Coke, and Mansfield, it was a question of the jury having abused their discretion in rendering a verdict for manifestly excessive damages often "without any bad motive at all; from inexperience in business, incapacity, misapprehension, inattention to circumstances, and a thousand other innocent causes." Always praising the common law, after quoting Bracton to the effect that the verdict should be amended if the jury have erred, or "the matter referred to a higher tribunal," Blackstone says: "And it is worthy of observation, how infinitely superior *to* all others the trial by jury approves itself, even in the very mode of its revision." Book III, Ch. 24; Lewis' Blackstone, pp. 1348–9. The procedure of referring the issue of excessive damages to a higher tribunal was one of the things that Blackstone said rendered perfect that most excellent method of decision "which was the glory of the English law." Maugre this: shall we

6. See Appendix, Comment 6

repudiate such "excellent method of decision," as violative of the common law of England in 1791? The effort of the common-law judges of the higher tribunal to ascertain the facts (the evidence of which was not, as now, preserved verbatim) is commendable. It was often disclosed to the court by affidavits or was taken from the "information" of the judge, "who usually made a special and minute report of the evidence." Now, with the facts before them, stenographically reported, the majority of appellate federal courts refuse to consider the excessiveness of verdicts if supported by any substantial evidence, and refuse to determine the maximum or minimum amount that will be permitted to stand; but, if they think the verdict is against the weight of the evidence, they may scan the record of the trial more closely for error, and probably send the case back for an arduous, expensive, and long-delayed new trial, when a remittitur of the excessive amount would be better for the plaintiff and without prejudice to the defendant.

In Miller v. Maryland Casualty Co., 40 F.2d 463, 465, decided in 1930, the Second Circuit refused to follow the Lepisto case, (Cabb v. Lepisto) 9 Cir., 6 F.2d 128, but thought it might be desirable to give appellate courts the power to review the damages, and that only a procedural difficulty was presented, the Seventh Amendment being no bar, closing with this statement: "Until the practice is frankly changed, we must adhere to it as it exists." The court questioned the practice that it was bound to decide the issue by such "tenuous unrealities," as whether the trial judge was acting within the bounds of "tolerable conclusion" in determining that the jury was within the bounds of "reasonable inference from the evidence", when it assessed the damages at the amount stated in the verdict. Courts should not engage in such scholastic refinements, said Judge Learned Hand.

At common law, in re-examining the issue of damages that had been tried by a jury, the higher court (to which Bracton and Blackstone referred) was re-examining a question of fact; it was looking to the verdict that the jury had rendered and to the facts upon which the verdict was based. It was a question of the manifest excessiveness of the verdict, and this issue was re-examined before the judgment was entered. One office or function of the motion for a new trial was an appeal from the verdict upon an alleged error of fact by the jury.[7] If the verdict was sustained, judgment thereon was entered; if the verdict was found to be manifestly excessive, it was moderated by the justices or a new trial granted. The federal appellate practice of looking at the verdict through the eyes of the trial judge (evidently in an attempt to convert an issue of fact into a question of law) grew up in this country during the existence of a federal statute that prohibited any reversal on appeal for an error of fact. This is the simple truth that cannot be denied or explained away except by saying that this "higher court" was exercising original not appellate jurisdiction, and that is an explanation which cannot be supported by English authorities. Yet the common law alluded to in the Seventh Amendment is the common law of England, and our federal decisions are not primary authorities as to the common law of England; but we do have a primary authority as to the meaning of the Seventh Amendment, when Mr. Justice Story, speaking for the court, says: "Beyond all question, the common law here alluded to is not the common law of any individual state, (for it probably differs in all), but it is the common law of England, the grand reservoir of all our jurisprudence." U. S. v. Wonson, Fed.Cas.No.16,750, 1 Gall. 5. Then let us be direct, and take the English common-law approach to the problem, as required by the Seventh Amendment.

Why should we look to federal decisions to ascertain the rules of the common law when the unquestioned construction of the Seventh Amendment indicates the common law of England as the pattern that is to be copied? Why should we not follow

7. See Appendix, Comment 7.

the common-law method of moderating excessive verdicts instead of devising a substitute therefor?[8] The substitute, however, is not unconstitutional, because it is not the minutiae but the substance of trial by jury that is preserved by the Seventh Amendment. A fortiori, the genuine procedure, exactly according to the rules of the common law, is not unconstitutional. Under the substitute, an appellate court has no power to review directly an error of fact committed by the jury in rendering a manifestly excessive verdict; but if the verdict is inordinate or monstrous (after scanning the record more closely for errors and not finding any), the appellate court may determine whether or not the trial court abused its discretion in not setting the verdict aside as manifestly excessive. Detroit Taxicab & Transfer Co. v. Pratt, 6 Cir., 2 F.2d 193; Carter Coal Co. v. Nelson, 4 Cir., 91 F.2d 651, 654; Western Union Tel. Co. v. Dismang, 10 Cir., 106 F.2d 362, 364; Southern Fruit Distributors v. Fulmer, 4 Cir., 107 F.2d 456, 459; Virginian Ry. Co. v. Armentrout, 4 Cir., 156 F.2d 358, 400, 409; 2 Am.Jur. 907, 911. This is judging by remote control, and at best is a circuitous, uncertain, and unsatisfactory method. A verdict that is manifestly excessive is inordinate; and may in some instances be termed monstrous.[9] Each of the three adjectives describes something unusual, abnormal, extraordinary. At common law the Court of King's Bench did not engage in any tenuous refinements as to the meaning of these words.

Next to doing right, says Blackstone (Lewis' Ed., p. 1349), the great object in the administration of public justice should be to give public satisfaction, and if the verdict be liable to many objections and doubts, no party would go away satisfied unless he had a prospect of reviewing it. "He would arraign the determination as manifestly unjust, and abhor a tribunal which he imagined had done him an injury without a possibility of redress." From the Judiciary Act of 1789 down to this date, all federal courts (district, circuit, and supreme) have had the express statutory power to grant new trials, in cases where there had been a trial by jury, for reasons for which new trials had usually been granted in the courts of law.[10] How, then, can we say, if convinced that this verdict is manifestly excessive, that we have no power to suggest a remittitur? Procedure by remittitur is implied in the power to grant new trials, and it should not be confused with the civil law practice. Blackstone answered this argument nearly 200 years ago by pointing out the distinction between the civil and the common law procedures. With us, he said, no new trial is allowed unless there be a manifest mistake, and the subject-matter be worthy of interposition, whereas by the civil law process the parties are at liberty to appeal from court to court upon questions merely of fact, "which is a perpetual source of obstinate chicane, delay, and expensive litigation." Lewis' Ed., p. 1350.

Finally, so far as appears, neither the question of excessive damages nor the question of appellate procedure by remittitur was considered by the court in Parsons v. Bedford, supra. On the merits the court held that, even if all the evidence on which the jury passed had been in the record, it could not examine the correctness of the verdict; yet in Parsons v. Armor, 3 Pet. 413, where a jury was waived, the court treated the evidence as a bill of exceptions, and "giving the utmost force to the testimony in favor of Armor" was of the opinion that the judgment must be reversed. It is not perceived why the same result should not have been reached, as a matter of law, if all the evidence had been in the record in Parsons v. Bedford, 3 Pet. 433, 7 L.Ed. 732, and the court had given "the utmost force" to the proffered testimony in favor of Bedford. The latter case, due to its high source, is entitled to careful study and analysis, but it should not be followed on the scope and effect of the Seventh Amendment. It was written more than

---

8. See Appendix, Comment 8.

9. See Appendix, Comment 9.

10. See Appendix, Comment 10.

forty years after that amendment was submitted for adoption, and we have the same books and same source material from which to determine the common law of England as were available to the Supreme Court in 1830.[11] We should not close our minds to this great constitutional question.

McCORD, Circuit Judge, concurs in this dissent.

STRUM, Circuit Judge, took no part in this decision.

## APPENDIX

1. Minor v. Tillotson, 2 How. 392, 43 U.S. 392, 11 L.Ed. 134; Suydam v. Williamson, 20 How. 427, 15 L.Ed. 978; New York Cent. & H. Railroad Co. v. Fraloff, 100 U.S. 24, 25 L.Ed. 531; Wabash Railway Co. v. McDaniels, 107 U.S. 454, 2 S.Ct. 932, 27 L.Ed. 605; Kennon v. Gilmer, 131 U.S. 22, 9 S.Ct. 696, 33 L.Ed. 110; Wilson v. Everett, 139 U.S. 616, 11 S.Ct. 664, 35 L.Ed. 286; New York, Lake Erie, & Western R. Co. v. Winter's Administrator, 143 U.S. 60, 12 S.Ct. 356, 36 L.Ed. 71; City of Lincoln v. Power, 151 U.S. 436, 14 S.Ct. 387, 38 L.Ed. 224; Hansen v. Boyd, 161 U.S. 397, 16 S.Ct. 571, 40 L.Ed. 746; Van Boskerck v. Torbert, 2 Cir., 184 F. 419; Miller v. Maryland Casualty Co., 2 Cir., 40 F.2d 463, 464, note 1; Smith v. Socony Vacuum Oil Co., 2 Cir., 96 F.2d 98; Bradham v. State, 96 F.2d 210; Swift & Co. v. Ellinor, 5 Cir., 101 F.2d 131; Home Ins. Co. v. Tydal Co., 5 Cir., 152 F.2d 309, Id., 5 Cir., 157 F.2d 851; Reid v. Nelson, 5 Cir., 154 F.2d 724; Virginian Ry. Co. v. Armentrout, 4 Cir., 166 F.2d 400; Crowell-Collier Pub. Co. v. Caldwell, 5 Cir., 170 F.2d 941; Dowell v. Jowers, 5 Cir., 182 F.2d 576.

2. See cover page of modernized edition of Blackstone's Commentaries by Dean Bernard C. Gavit, Indiana University School of Law.

3. Holdsworth's History of the Common Law, Vol. 1, p. 212.

4. Ducker v. Wood, 1 Term Reports, 277.

5. *Si juratores erraverint, et justiciarii secundum eorum dictum judicium pronuntiaverint, falsam faciunt pronuntiationem; et ideo sequi non debent eorum dictum, sed illud emendare tenentur per diligentem examinationem. Si autem dijudicare, nesciant, recurrendum erit ad majus judicium.* Lewis' Blackstone, page 1348.

6. There were four principal writs in the nature of appeals from proceedings in the king's courts of law. There were writs of attaint, of deceit, of audita querela, and of error. The writ of attain was a very old remedy for reversal of a verdict unduly given. It was devised in lieu of the ferocious Norman remedy of trial by battle. As the writ of attaint succeeded the right of trial by battle, so the motion for a new trial was devised as one of several remedies by which an attaint might be avoided. The motion struck at errors of fact not appearing of record, because the testimony of witnesses was submitted viva voce in the presence of the jury, and was not reduced to writing. The practice of setting aside verdicts upon motions so far superseded proceedings in attaint, that few instances of them appear later than the 16th century. In 1764, Rainsford, C. J., said: "Juries are wilful enough, and denying a new trial here will but send parties into Chancery." Martin's Civil Procedure, p. 308; Lewis' Blackstone, pp. 1348, 1363; Stephen on Pleading, pp. 95, 96; 5 Harvard Law Review, p. 386.

7. Just as was the appeal to trial by battle or by writ of attaint, according to Bracton, Fleta, and Blackstone: 3 Blackstone 351, 393; Bracton, 1.4 tr. 1, c; Fleta 1.5, c. 22, Sec. 8.

8. Dimick v. Schiedt, 293 U.S. 474, at page 488, 55 S.Ct. 296, at page 302, 79 L.Ed. 603, wherein Mr. Justice Stone, dissenting, said: "In denying the motion, the trial judge relied on two rules of the common law which have received complete acceptance for centuries. One is that the court has power to act upon a motion to set aside the verdict of a jury because inadequate or excessive, and in its discretion to grant or deny a new trial. New

---

11 See Appendix, Comment 11

York Cent. & H. Railroad Co. v. Fraloff, 100 U.S. 24, 31, 25 L.Ed. 531; Wilson v. Everett, 139 U.S. 616, 621, 11 S.Ct. 664, 35 L.Ed. 286; City of Lincoln v. Power, 151 U.S. 436, 438, 14 S.Ct. 387, 38 L.Ed. 224. The other, which is implicit in the first, is that it has power to determine, as a matter of law, the upper and lower limits within which recovery by a plaintiff will be permitted and the authority to set aside a verdict which is not within those limits. Arkansas Valley Land & Cattle Co. v. Mann, 130 U.S. 69, 74, 9 S.Ct. 458, 32 L.Ed. 854. Cf. Southern Ry. Co. v. Bennett, 233 U.S. 80, 87, 34 S.Ct. 566, 58 L.Ed. 860."

9. *Excessive* and *extraordinary* are given in the dictionaries as meaning the same as, and being synonymous with, *monstrous*. See Webster's New International Dictionary, Funk & Wagnalls New Standard Dictionary, and Webster's Revised Unabridged Dictionary of the English Language.

10. Sec. 17, Judiciary Act of 1789, Sec. 726 of Revised Statutes of the United States, Sec. 269 of the Judicial Code of 1911, Sec. 391 of Title 28, Code of 1940; Sec. 2106 of Code of 1948, 28 U.S.C.A. In an excellent article by Roscoe Pound, in 1910, much of which has found its way into our present Federal Rules of Civil Procedure, it is said: "Upon any appeal, in any sort of cause, the court should have full power to make whatever order the whole case and complete justice in accord with substantive law may require, without remand, unless a new trial becomes necessary." The principles of this suggestion are now fully contained in Section 2106 of the Judicial Code of 1948.

The following quotation from said article is also very pertinent here: "At common law, after trial at nisi prius, the cause was heard by the court in banc upon rule for a new trial or motion in arrest or for judgment non obstante. In that simple proceeding and not in the writ of error, an independent proceeding of a formal and technical character, is the true analogy for appellate procedure. Unhappily, the other has been followed." Vol. 71 of The Central Law Journal, p. 228. This failure

to follow the simple procedure of the common law in treating the motion for a new trial as an independent proceeding of an appellate nature may be called the greatest procedural error in the judicial history of the United States.

11. "The seventh amendment does not provide that facts tried by a jury shall not be re-examined, but that they shall not be re-examined otherwise than according to the rules of the common law. * * * It is only where the appellate court may reverse on the facts and then proceed to a final determination of the case that trial by jury has been destroyed." Article by William Wirt Blume, entitled Review of Facts in Jury Cases—The Seventh Amendment, October, 1936, Journal of American Judicature Society, Vol. 20, p. 130.